# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# COLUMBIA DIVISION

**CURTIS  SHEPHERD**

**PLAINTIFF(S)**

V.

**WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE FAILURE TO COMPLY WITH POOLING AND SERVING AGREEMENT AS BANK CUSTODIAN. CUT -OFF DATE June 1, 2005, ROGERS TOWNSEND & THOMAS, LENDER PROCESSING SERVICES, INC, (hereinafter "LPS") LPS DEFAULT  SOLUTIONS, Inc. Docx MORTGAGE, ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR LENDER AND LENDER'S SUCCESSORS AND ASSIGNS, AND WELLS FARGO BANK, N.A JASON T. MOSS, , AND JOHN J.HEARN, JASON D. WYMAN, KEVIN T. BROWN, CYNHIA THOMAS**

**DEFENDANTS**

**18 U.S. Code § 1345 – Injunctions against fraud**

**JURY TRIAL DEMANDED**

RECEIVED
USDC CLERK, COLUMBIA
2022 JUN -8  AM 9: 59

## MOTION FOR AN _EX-PARTE_ TEMPORARY RESTRAINING ORDER, SHOW CAUSE ORDER, AND PERMANENT INJUNCTION WITH ASSET

## FREEZE

## COMPLAINT FOR PERMANENT INJUNCTION

## TO: THE HONORABLE COURT AND ALL PARTIES OF RECORDS

Defendants MR. CURTIS SHEPPARD, specifically Reserving all rights pursuant to Any. and all motions previously served. Answering the Complaint of the Plaintiffs and asserting an 18 U.S. Code § 1345 – Injunctions against fraud, Would Allege unto this Honorable Court as Follow…

Plaintiffs' requests that the Pro se status is recognized and treated By the Court as The United States Supreme Court and US District Courts have held such status be recognized and treated.  "A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers". Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); see also Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Gillihan v. Shillinger, 872 F.2d 935, 938 (10th Cir.1989). "We hold pro se pleadings to a less stringent standard than pleadings drafted by attorneys and construe them liberally". Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam); Elmore v. McCammon (1986) 640 F. Supp. 905 "…the right to file a lawsuit pro se is one of the most important. rights under the constitution and laws. "Alexander v. Bothsworth, 1915. "Party cannot be bound by contract that he has not made or authorized Free consent is an indispensable element in making valid contracts."

**NOW COME** PLAINTIFFS respectfully requests, pursuant to MR. CURTIS SHEPPARD, 18 U.S. Code § 1345, and 18 U.S.C. § 1345(a) and 18 U.S.C. §§ 1345(b), (a)(2). that this Honorable Court issues an Ex-Partee

Temporary Restraining Order and an order 2 FIDELITY/LPS, WELLS FARGO BANK

N.A. TRUST COMPANY, AS TRUSTEE FAILURE TO COMPLY WITH POOLING

AND SERVING AGREEMENT AS BANK CUSTODIAN. CUT -OFF DATE June

1, 2005, ROGERS TOWNSEND & THOMAS, LENDER PROCESSING

SERVICES, INC, (hereinafter "LPS")  LPS DEFAULT  SOLUTIONS, Inc. Docx

MORTGAGE, ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR

LENDER AND LENDER'S SUCCESSORS AND ASSIGNS, AND WELLS FARGO

BANK, N.A JASON T. MOSS, AND JOHN J.HEARN, JASON D. WYMAN, KEVIN

T. BROWN, CYNHIA THOMAS, and any Other Foreclosure Mill, WELLS FARGO

BANK AS TRUSTEE FIDELITY NATIONAL TITLE INSURANCE COMPANY, LPS'

Desktop system to show cause why a preliminary injunction should not be issued

pursuant to MR. CURTIS SHEPPARD, Section 1 of the Sherman Act (15 U.S.C. ß1).

for the following reasons and for the reasons outlined in the Attached Complaint in

support:

## I NATURE OF ACTION

**1.** This action seeks to recover damages arising out of and

relating to an ongoing, global RICO Enterprise which engaged in predicate

acts of a pattern of racketeering and conspiracy to commit RICO, through

and by means of Money Laundering, Foreclosure Fraud, Concealment of

Default Insurance Invoice settlement services for payment by $1,625,400,

and Bid Rigging

**2.** The Money Laundering scheme to control property through acquiring invisible interests in third parties continues to be carried out by defendants and involves a pattern of brazen racketeering predicate acts committed in this district, as well as outside of the United States through shell corporations to avoid detection, which shell entities are then dissolved after the unlawful transactions to conceal their unlawful purposes

**3.** Defendants engaged in a pattern of racketeering activity to commit the aforesaid crimes, together with others who were aware of, and acted in furtherance of one another's actions and intentions in connection with a sophisticated scheme of the Enterprise to control the proceedings filed in **STATE OF SOUTH CAROLINA COUNTY OF ORANGEBURG IN THE COURT OF COMMON PLEA,** Are Defendants in  **Civil Action #: CASE NO: 14-CP-38-0094-** filed in this Court 18 U.S. Code § 1345 – Injunctions against fraud Division through Fraud.

    A. SUMMON AND COMPLAINT 2011…BOGUS
    B. LIS PENDING FILED 2011… BOGUS
    C. ASSIGNMENT: OF MORTGAGE April 28th, 2012, BOGUS
    D. Date of ASSIGNMENT OF MORTGAGE OCTOBER 25TH, 2013 BOGUS
    E. WELLS FARGO BANK N.A.TRUST COMPANY, CUT OFF 2005
    F. ORDER OF REFERANCE 2013 TO 2018…BOGUS
    G. BANKRUPTCY CHAPTER 13 FROM…DECEMBER 12, 2013, TO LAST FILING DATE: 11/26/2017
       PLAN CONFIRMED DATE: 09/07/2017
       TERMINATED: DATE:        09/07/2017

        **4.** The RICO conspiracy and unlawful predicate acts of the defendants were to invest in, operate, and acquire control of various

entities involved in continuing fraudulent transactions and surreptitious and conspiratorial alliances and agreements involving numerous parties whereby the Enterprise, assisted in part by conspirators, through unlawful means, including but not limited to Money Laundering, Foreclosure Fraud, Concealment of Default Insurance Invoice settlement services for payment FIDELITY/LPS, Temporary Restraining Order and an order FIDELITY/LPS,

WELLS FARGO BANK  N.A. TRUST COMPANY, AS TRUSTEE FAILURE

TO COMPLY WITH POOLING  AND SERVING AGREEMENT AS BANK

CUSTODIAN. CUT -OFF DATE June 1, 2005, ROGERS TOWNSEND &

THOMAS, LENDER PROCESSING SERVICES, INC, (hereinafter "LPS")

LPS DEFAULT  SOLUTIONS, Inc. Docx and any Other Foreclosure Mill,

WELLS FARGO BANK AS TRUSTEE FIDELITY NATIONAL TITLE

INSURANCE COMPANY, LPS' Desktop system and Bid Rigging, and

thereafter attempted to conceal their illicit activities.

## Plaintiffs Would Like This COURT TO MEET THE GLOBAL RICO Enterprise

**a.** **LPS** claims that its subsidiary, LPS Default, is the nation's leading provider of "default solutions" to the mortgage servicing industry

**b.** **LPS** has stated in a filing with the Securities & Exchange Commission that:

**c.** **LPS represents that 39 of the 50 largest banks in the United States**

based on 2007 ratings Use its services. ████████████████
████████████████████ the "MSP") which Processes over 50% of all residential mortgage loans by dollar volume. Its outsourcing services Include ████████████████████, which are used by ████████ and ████████████████ and r████████ ████ ."5 Reduce the expense of managing defaulted loans...."



## THE RELEVANT STATUTESTHE RELEVANT STATUTES

**5.** The relevant statutes involved in this action involve:

**a.** Fraud Injunction Statute, 18 U.S.C. § 1345,

**b.** 18 U.S.C. § 1345(a)

**c.** 18 U.S.C. §§ 1345(b), (a)(2).

**d.** Racketeering Influenced and Corrupt Organizations Act, 18 USC §§1961—1964,

**e.** Conspiracy to violate RICO pursuant to 18 USC §1962 (d);

**f.** Money Laundering, 18 USC §1956;

**g.** Fidelity's conduct is criminal under 18 U.S.C. § 155

**h.** Anti-Trust Bid Rigging, 15 USC §1 et seq.

**i.** Pursuant to Art. V, 4 of the South Carolina Constitution, Rule 402(k), the Oath of Office for Attorneys

**j.** 18 U.S.C. § 1001

**k.** 18 U.S.C. § 1010

**l.** 18 U.S.C. § 1014

**m.**     18 U.S.C. § 1028

**n.** 18 U.S.C. § 1341

**o.** 18 U.S.C. § 1342

**p.** 18 U.S.C. § 1343

**q.** 18 U.S.C. § 1344

**r.** 15 U.S.C. § 1601 et seq

**s.** South Carolina General Statute § 39-5-10 et seq.; in violation of the South Carolina Unfair Trade Practices Act, Ann. § 39-5-10 et

**t.** False Claims Act, (FCA), 31 U.S.C. §§ 3729 – 3733

**u.** Civil Rights Act (Title 18 U.S.C. §§ 1983-1988); Under RICO (Title 18 U.S.C. §§ 1961-1965);

**v.** The attorney fee fixing provisions of the Network Agreement are a criminal violation of 18 U.S.C. § 155.

**w.** Rule 5.4 - Professional Independence of a Lawyer, S.C. R A lawyer or law firm shall not share legal fees with a non-lawyer, except that:

A lawyer shall not form a partnership with a non-lawyer if any of the Activities of the partnership consist of the practice of law

**x.** FIDELITY/LPS Sharing Legal Fees with-Lawyers is illegal, and **FIDELITY / LPS is not a Law Firm.**

**6.** Upon information and belief, the illicit conduct of the defendants is continuing in nature and involves interstate commerce.

**7.** Due to the extraordinary sophistication of the defendants' surreptitious and conspiratorial conduct, plaintiffs expect to expose additional defendants, and additional statutory violations and illicit conduct during the pre-trial discovery in this action.

**8.** As a result of the illegal activities alleged in this complaint, the defendants caused direct and consequential damages to plaintiffs

**9.** Upon information and belief, the illicit conduct of the defendants is continuing in nature and involves interstate commerce.

**10.** As a result of the illegal activities alleged in this complaint, The defendants caused direct and consequential damages to plaintiffs.

**11.** Pursuant to the right to appear pro se in a civil case in Federal court is defined by statute 28 U.S.C. § 1654.

**12.** <u>**Elmore v. McCammon**</u> (1986) 640 F. Supp. 905 "...the right to file a lawsuit pro se is one of the most important. rights under the constitution and laws



**16.** **THE INTERVENERS** move this Court to take Judicial Notice of Brown's information and Plea Agreement because the documents

confirm that LPS employees engaged in a massive fraud scheme in the preparation of hundreds of thousands of mortgage-related documents, including Mortgage Assignments, and Mortgage Allonges and GEBHARDT contends that the Mortgage Assignments and Mortgage Allonges prepared and filed by LPS in her case, bearing the purported signatures of Giana Yeager, Christine Renner, Alissa M. Shellito, Betty Wright, Diane M. Meistad, are such fraudulent mortgage assignments.

**17.**     PAYOFF EXPRESS IN DEFAULT: Working with FIS MSP, Process Management will provide real-time payoff quotes for loans serviced using the FIS-MSP platform. A Process Management user will be able to request a payoff quote directly from Process Management. This feature will be coupled with the Fees and Costs capability in Process Management to return not only a payoff quote from MSP, but also the latest fees and costs from any attorney working the default action, U.S. Code § 1345 – Injunctions against fraud

**18.**     By way of background, LPS Control residential mortgage Services WELLS FARGO BANK N.A. ("WFB"), to (among other things) assist In creating and executing mortgage-related documents filed with recorders' offices across the country.

**19.**    At the direction of Brown and other co-conspirators, employees of LPS, including those who were not authorized to sign documents and temporary workers hired to sign documents without quality control and without legally required knowledge specific to the Mortgages for which the documents were prepared, began forging and falsifying signatures of the mortgage-related documents that they had been hired to prepare and file with property recorders' offices.

**20.**    After these documents were falsely signed and falsely notarized, Brown and her co-conspirators authorized LPS employees to file and record with property recorders' offices across the country.

**21.**    Many of LPS's temporary employees signed thousands of mortgage assignments each day, often signing the names of other persons on the Mortgage Assignments that would then be witnessed and notarized. These employees often signed as officers of banks and mortgage companies. The employees signed without reading the documents or in any way ascertaining the truth of the matter presented therein, including the grantor, grantee, and the date of the purported transfer.

**22.**    Many of the documents, including mortgage assignments And lost note affidavits, were later relied upon in court proceedings including foreclosure proceedings and federal bankruptcy actions.

**23.**    Brown admitted that she and others took various steps to conceal their actions from law enforcement authorities and others. These steps to conceal included testing new employees to ensure they could mimic [forge] signatures.

**24.**    pursuant to Federal Rule of Evidence 201 THE INTERVENERS move this Court to take Judicial Notice of the Information and Plea Agreement of <u>Lorraine Brown United States of America v. Lorraine Brown, Case No. 3:12-cr-198-J-25 MCR, (M.D. Fla</u>.) with a hearing, and for such other and further relief as this Court deems just and proper under the circumstances

**25.**    See: <u>**Fladell, et al. v. Wells Fargo Bank NA,**</u> et al., Case No. 0:13-cv-60721, in the U.S. District Court for the Southern District of Florida.09/18/2014(hereinafter "Civil Action").

**26.**    The Civil Action alleges that ("WFB"), engaged in violations Of the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901-4043, By conducting foreclosures, without a court order or valid waiver of SCRA rights, of real property owned by SCRA-protected servicemembers.

**27.**    Plaintiffs, and the United States of America, by United States Attorney Merrick B. Garland, and the State of South Carolina, upon relation of Attorney General Merrick B. Garland, Attorney General of United

States of America, through undersigned THE INTERVENERS U.S.
Department of Justice ("DOJ") Attorney General Merrick B. Garland, and
THE INTERVENERS U.S. Department of Justice ("DOJ") Assistant Attorney
General Kristen Clarke Civil Rights Division/ THE INTERVENERS U.S.
Department of Justice ("DOJ") Richard A. Powers Acting Assistant Attorney
General ANTITRUST DIVISION. respectfully request that the Court issue an
ex parte temporary restraining order and preliminary injunction to protect
the public by stopping Defendants 'ongoing fraud and preventing the
dissipation of the proceeds of the fraud.

28.    ██████████████████ MOSS & ASSOCIATION
ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK
N.A. TRUST COMPANY, AS TRUSTEE previously filed motion to
Foreclosure on Plaintiffs MR. CURTIS SHEPPARD  property, 18 U.S. Code
§ 1345 – Injunctions against fraud as factually insufficient MR. CURTIS
SHEPPARD  hopes to have addressed FIDELITY/LPS, MOSS &
ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO
BANK N.A. TRUST COMPANY, AS TRUSTEE FIDELITY NATIONAL TITLE
INSURANCE COMPANY concern with this Pleading.

29.    Given the extensive factual background associated with
This matter, Plaintiffs MR. CURTIS SHEPPARD has  Attempted with each
defense and cause of action to include only the most Salient facts relevant

to the defense or cause of action. However, all facts and other material pled herein are to be deemed incorporated into Each Defense and cause of action unless inconsistent.

30.    Given the unusual nature of this case, several requests below. Constitute Novel legal theories presenting issues of first impression. Plaintiffs MR. CURTIS SHEPPARD, is not Aware of any Binding precedent foreclosing the claims herein, but to the Extent there is Plaintiffs MR. CURTIS SHEPPARD, respectfully Seeks that the Court allow good-faith argument for a Change in the law.

31.    Some allegations against FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE is Made based on vicarious liability of one form or another. Some Vicarious Allegations rest on agency theories, while some rest on a theory of joint-And-several liability applicable to joint venturers and co- conspirators.

32.    Further, Plaintiff's position is that as a matter of equity FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE, FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE "stands in the shoes" of FIDELITY NATIONAL FINANCIAL TITLE INSURER, LPS' DEFAULT MANAGEMENT SERVICES AGREEMENT, (technically, FIDELITY NATIONAL FORECLOSURE

SOLULATIONS, INC A Division of FIDELITY NATIONAL DEFAULT

SOLULATIONS SERVICES AGREEMENT, d/b/a ROGERS TOWNSEND &

THOMAS, PC  and Attorneys JOHN J.HEARN Bar #6635), JASON D.

WYMAN Bar Number:#100271), KEVIN T. BROWN, Bar Number:#64236)

CYNHIA THOMAS ROGERS TOWNSEND & THOMAS, PC, shareholders

of FIS's received one-half share of the Common Stock for every share of

FIS common stock held as of the close of business in June 24, 2008. FIS's

shareholders collectively received 100% of the Common   Stock of the

Registrant, who is now a stand-alone public company trading

under the symbol "LPS" making Plaintiffs Owners) (████████████████

████████ ██████████████████, for many of the defenses and claims here.

Plaintiff's most definitely seeks a judgment that FIDELITY/LPS, THOMAS



## EXHIBIT-A

## Fidelity National Title Group &

## HUTCHENS LAW FIRM LLP

**Fidelity National Title Group** is a member of the Fidelity National
Financial (NYSE: FNF) family of companies and the nation's largest group
of title companies and title insurance underwriters - Chicago Title Insurance
Company, Commonwealth Land Title Insurance Company, Fidelity National
Title Insurance Company, Alamo Title Insurance, Lawyers Title, and Ticor

Title - that collectively issue more title insurance policies than any other title company in the United States.



## NATIONAL RATE CALCULATOR

The National Rate Calculator provides Title Insurance Rates only. Lenders and other customers obtaining quotes for loan estimates and/or title and settlement rates must use the Title & Settlement Rate Quote calculator.

*Online quotes are not available for IA, IL, IN, KS, MO and OK.*

**RateCalculator.FNF.com**

## TITLE & SETTLEMENT RATE QUOTE CALCULATOR

If you are a Real Estate professional or Lender and do NOT require a customized quote, then please click the Access Public Rate Calculator link to use our Public Rate Calculator.

**Rates.FNTG.com**

Alamo Title Insurance

CHICAGO TITLE INSURANCE COMPANY

Additional Services

FIDELITY NATIONAL HOME WARRANTY

Commonwealth LAND TITLE INSURANCE COMPANY

Fidelity National Title Insurance Company

FIDELITY RESIDENTIAL SOLUTIONS A Subsidiary of Fidelity National Financial, Inc.

IPX 1031

Lawyers Title

TICOR TITLE

FIDELITY NATIONAL TIMESHARE

SERVICELINK

 

ROGERS TOWNSEND & THOMAS, PC, , WELLS FARGO BANK N.A.

TRUST COMPANY, AS TRUSTEE, has no right to sue over Wrongful

Foreclosure Action." but it would be inequitable if FIDELITY/LPS, ROGERS

TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST

COMPANY, AS TRUSTEE could come to Court asserting rights it well

Knows it does not have, then use its lack of those rights to defend against

**18 U.S. Code § 1345 – Injunctions against fraud** or defeat defenses.

> **33.**    Formerly a branch of Fidelity National Financial - the nation's largest title insurer - LPS was spun off in 2008. It is still housed in the same complex as the title company, in one of two twin 12-story buildings with expansive views of the Jacksonville waterfront. With 8,900 employees, it is one of the city's largest employers

> **34.**    Similarly, Plaintiff's MR. CURTIS SHEPPARD, submits that, for certain purposes in this litigation, they too are Entitled to file PLAINTIFF'S… MOTION FOR AN EX-PARTE TEMPORARY RESTRAINING ORDER, SHOW CAUSE ORDER, AND PERMANENT INJUNCTION WITH ASSET FREEZE. It is unusual situation where a Defendants with no standing sues the wrong Plaintiff's, but that is the story of this case.

> **35.**    Defendants engaged in a fraudulent scheme, relying on

Myriad illicit business practices in order to artificially inflate the Company's revenue and stock price. As a result of the fraud described herein, shareholders suffered millions of dollars in losses. In addition, the Company is also now facing multiple government investigations by federal and state authorities, including the Department of Justice, the United States Attorney General, and the Attorneys General of multiple states.

36.     LPS was formed in July of 2008 as a spin-off from Fidelity National Information Services, Inc. ("FNIS"), at which time it became a publicly traded company. The Company provides mortgage processing services, settlement services and default solutions, as well as servicing and technology solutions to mortgage lenders. In particular, the Company's technology solutions include software and web-based applications that automate loan processing. The Company's mortgage-processing services include loan facilitation and default management services.

37.     As the economy slumped in 2008 and the foreclosure rate rose, Defendants utilized a "fool-proof" business model to increase market share, drive revenues, and artificially inflate LPS' stock price. This business model, which ultimately achieved the profits Plaintiffs sought, was steeped in illicit practices. Under this business model, LPS offered default management services free of charge to clients – banks and mortgage servicers – many of whom already used the Company's

technology solutions. As further detailed below, these services included administrative and support services to assist in managing the foreclosure process. Banks and mortgage servicers who were flooded with foreclosures readily welcomed this hard-to-refuse offer.

38.    In order to generate revenues from its business model, LPS put together a "network" of attorneys to help service its clients' Foreclosure cases. In order to be a part of the LPS network, attorneys had to execute a "Network Agreement" with LPS. This agreement imposed significant limitations on attorneys and set forth improper fee arrangement between LPS and network attorneys. Indeed, network lawyers were required to pay illegal "referral fees" to LPS as certain legal work was accomplished in the cases they were handling. Attorneys were conscripted into this network because LPS offered a steady flow of legal work and, as LPS was the nation's largest servicer, attorneys who were not part of the network would be at a competitive disadvantage in landing foreclosure cases. By financing its business model with attorneys' fees rather than by charging clients, LPS had a unique competitive advantage and was perfectly positioned to profit from the foreclosure crisis.

39.    LPS needed to keep its network attorneys under its thumb and operating at its whim so that it could push through foreclosures as quickly as possible, earn more business from bank and servicer clients, expand its market share, charge more fees to attorneys, and increase

the Company's profits. In order to do this, LPS required its attorneys to follow certain timeframes in managing cases and strongly discouraged them for communicating with clients. All communications went through LPS' Desktop system – the Company's work-flow processing web-based software application. In this way, LPS managed the flow of information between clients and network attorneys. LPS also tracked its network attorneys through an internal metric known as Attorney Performance Reviews ("APR"), which ranked attorneys based on how quickly they performed tasks on behalf of servicers. Network attorneys had to learn to operate successfully within the confines of the APR to continue to receive LPS referrals. While these limitations eviscerated the attorney-client relationship and the quality of the work performed, to be successful in the LPS network, network attorneys had to play by LPS' rules.

**40.**     Due to hard economic times marked by record Foreclosure rates, and as a result of its successful albeit improper business model, LPS had a tremendous volume of default work to process. The Company was determined to push this work through the Company's system as quickly as possible in order to drive market share and profits. To achieve this, LPS employed various illicit practices at its offices – which included its Jacksonville, Florida headquarters, its LPS Default Solutions, Inc.  Subsidiary in Mendota Heights, Minnesota, and its document solutions subsidiary (DocX, LLC ("DocX")) in Alpharetta, Georgia – to churn as many

Files as quickly as possible.

41.     These illicit practices were pervasive throughout the Company during the Fraudulent Foreclosure Period and included the fabrication of documents, "robo-signing," the forging of documents, Improper notarization, violation of security protocols, and the concealment of known mistakes from courts, attorneys, and clients. For instance, through DocX, the Company engaged in the wholesale fabrication of mortgage assignments, which were filed with county clerk offices and used as evidence by LPS' clients in foreclosure proceedings to evict homeowners. Moreover, to increase the speed at which it processed mortgage-related documents, LPS required its employees to engage in "robo-signing" and "surrogate signing." "Robo-signing" involved LPS employees signing mortgage related documents at record speeds without verifying their accuracy. "Surrogate-signing" or forging, as it was internally known, involved LPS employees forging the names of various bank officials on these same mortgage documents. These problematic documents were then improperly notarized by LPS Fraudulent Foreclosure employees who wholly ignored notarization protocols by failing to verify the signatories' identities

42.     LPS' efforts to push through work as quickly as possible to drive market share and profits created a culture which valued speed over accuracy and encouraged the concealment of known mistakes. LPS employees were rewarded for their speed, and this resulted in the

violation of security protocols and significant and pervasive errors in the default services that they were providing (e.g., the application of mortgage payments to incorrect accounts). Even when these problems were discovered by the Company's internal auditors, LPS swept them under the rug. Indeed, LPS knowingly concealed errors in files from clients, network attorneys, and courts to keep clients happy and to ensure that a finger could not be pointed at LPS.

**43.**    Through these illicit practices, LPS' revenues rose significantly throughout the Fraudulent Foreclosure Period. In particular, default management services revenue nearly doubled. While Plaintiffs continuously touted these revenues and the market share the Company was gaining, they failed to disclose to investors that its attorney-reliant model and illicit business practices drove these achievements. In such a way, Plaintiffs artificially inflated LPS' stock price during the Fraudulent Foreclosure Period

**44.**    Eventually, the Company's illicit business scheme began to unravel. As detailed below, through a series of partial revelations beginning on April 16, 2009, the market began to learn the truth regarding the Company's improper business model and illicit business practices. Indeed, revelations on April 16, 2009, April 3, 2010, and October 1, 2010 through October 4, 2010, caused the stock price to plummet by Approximately 13%, 4%, and 13%, respectively, on unusually heavy trading volume, resulting in millions of dollars in investor losses. At the same time

that investor learned bits and pieces of information regarding the
Company's true business practices, Plaintiffs continued to mislead the
market through false assurances and outright lies. In such a way, Plaintiffs
prevented the market from learning the full truth and kept the Company's
stock price artificially inflated throughout the Fraudulent Foreclosure
Period. Indeed, had the market been apprised of the full truth about
plaintiffs' practices, the impact on LPS' stock price would have been far
more dramatic. Plaintiffs' fraud has not gone unnoticed. The Company is
currently the subject of inquiries by the Department of Justice, the U.S.
Attorney General, and the Attorneys General of several states. LPS also
recently signed a consent order with various federal regulatory bodies,
which requires it to intensely review and remediate the Company's
practices. In addition, the Company is the subject of litigation throughout
the country related to the practices described herein

  **45.** On information and belief, the system is so organized that
there is a company called Lender Processing Services, which allegedly
has created the means to systematize this fraud. ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

  **46.** On information and belief, The Summit is published
quarterly by the Customer/Attorney Relations Team for employees, clients,

and attorney firms in the Fidelity National Foreclosure Solutions

partnership. Demands strict proof thereof. at Jury Trial

47.    Fidelity National Foreclosure Solutions, Inc.'s Document

Execution teams are responsible for facilitating requests between attorneys

and clients for documents that need to be executed. FNFS has signing

authority for several our clients. Any documents that can be executed

by FNFS are executed and returned to attorneys, while those that must be

executed by clients are forwarded to clients or investors and are tracked

through a process within NewTrak called "Signature Required."

48.    In January 2006, FNFS introduced Signature Required

into NewTrak. This feature provides the opportunity for the attorney, FNFS

and the client to communicate regarding the execution of documents

relating to the foreclosure or bankruptcy. When attorneys click on the

Signature Required Button in NewTrak, a pop-up window opens for them to

identify the process for which the document needs to be executed. Once

the process is selected, a signature required process is opened for

attorneys to provide the document that needs to be executed through a

step in NewTrak. When the document is loaded into NewTrak, it

automatically prints in Minnesota for the Document Execution team to work.

Dune Capital Management

49.    In the midst of America's foreclosure crisis, an illicit

industry of mortgage modification scams began preying on desperate

consumer homeowners facing foreclosure and the loss of their homes. Using deceptive advertising and telemarketing to recruit homeowners, scammers have made money by charging distressed homeowners upfront fees on the promise that they could obtain mortgage modifications for those homeowners, often providing little or no actual assistance to the homeowners.

50.    To combat these practices, many states, including South Carolina, enacted laws to prohibit these schemes, and state regulators have enforced their unfair and deceptive trade practices laws, debt negotiation licensure requirements, and unauthorized practice of law prohibitions. In addition, federal regulators made it illegal in every state for mortgage assistance relief providers to charge homeowners a fee for mortgage modification services before actually obtaining mortgage modifications for those homeowners.

51.    In a twist on the typical loan modification rescue scam Designed to avoid regulatory scrutiny by creating the appearance of legitimacy, some veterans of such scams have shifted to selling homeowners' participation in so-called "mass-joinder" lawsuits. Homeowners are led to believe that they will be represented by real law firms and that joining a mass-joinder lawsuit will help them avoid foreclosure, reduce their interest rates and loan balances, and entitle them to monetary compensation.

**52.**     Since at least late 2004, an enterprise operating under
The name of the ROGERS TOWNSEND & THOMAS, PC, , WELLS
FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE Enterprise")
Has generated millions of dollars in illegal upfront fees by convincing 2
consumers to pay for the opportunity to be included as a plaintiff in these
so-called "mass-joinder" lawsuits against their mortgage lenders.

**53.**     Organized and largely controlled by a veteran of a similar
mortgage relief scam, the ROGERS TOWNSEND & THOMAS, PC, ,
WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE Enterprise
falsely promises that the lawsuits will induce banks to give the consumers
mortgage modifications or other forms of foreclosure relief. The Enterprise
uses these promises to convince consumers to pay fees before the
ROGERS TOWNSEND & THOMAS, PC, , WELLS FARGO BANK N.A.
TRUST COMPANY, AS TRUSTEE Enterprise Obtains, or even tries to
obtain, mortgage modifications for the consumers it signs up.

**54.**     In an attempt to circumvent state and federal consumer
financial law and take advantage of regulatory exemptions for the practice
of law, the ROGERS TOWNSEND & THOMAS, PC, , WELLS FARGO
BANK N.A.TRUST COMPANY, AS TRUSTEE. Enterprise holds itself
out as a law firm and promises legal representation. However, it is not
fundamentally different from any other loan modification scam, and its
conduct is prohibited by both federal and state law.

**55.**     The ROGERS TOWNSEND & THOMAS, PC, , WELLS
FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE Enterprise initiates

the scheme by sending misleading mailers that resemble Foreclosure

Fraudulent or Bogus action notices to consumers notifying them that they

are in a Foreclosure proceedings plaintiff in a "Local" lawsuit against their

particular Bogus mortgage lender or servicer for "Multiple claims of fraud

and misrepresentation." The mailers create a sense of urgency for

consumers to enroll a loan modification by a certain

date or risk exclusion and induce consumers into believing that by "opting-
in" they will receive a reduced interest rate, lower monthly payment,
principal reduction, loan forgiveness, and monetary damages

     **56.**    Consumers who respond to the mailers reach the

ROGERS TOWNSEND & THOMAS, PC, , WELLS FARGO BANK N.A.
TRUST COMPANY, AS TRUSTEE Enterprise's telemarketing
boiler room and are subjected to further high-pressure sales tactics by
commission-based, non-attorney sales agents for Foreclosure and
Bankruptcy Court

     **57.**    The ROGERS TOWNSEND & THOMAS, PC, , WELLS

FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE  Enterprise later

induces consumers to continue making monthly payments by providing

them with misleading information regarding the status and progress of the

lawsuits and by making further misrepresentations regarding the benefits of

participating in the lawsuits

**58.**    In reality, the ROGERS TOWNSEND & THOMAS, PC, ,

WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE. Enterprise

provides little or no meaningful assistance to struggling homeowners.

Rather, the ROGERS TOWNSEND & THOMAS, PC, , WELLS FARGO

BANK N.A.TRUST COMPANY, AS TRUSTEE, Enterprise's

Misrepresentations induce consumers into believing that participation in a

mass-joinder lawsuit will result in mortgage modifications or other forms of

foreclosure relief.

**59.**    To date, the ROGERS TOWNSEND & THOMAS, PC,

WELLS FARGO BANK N.A.  TRUST COMPANY, AS TRUSTEE

Enterprise has misled thousands of homeowners nationwide, and, as a

result, has pocketed at least millions for itself. The ROGERS TOWNSEND

& THOMAS, PC, , WELLS FARGO BANK N.A. TRUST COMPANY, AS

TRUSTEE,  Enterprise continues to solicit new consumers and take

payments from those who have already enrolled from the fraudulent

foreclosure and bankruptcy proceedings for attorney fees or

administrative fees.

**60.**    Plaintiffs bring this action to halt the ROGERS

TOWNSEND & THOMAS, PC, , WELLS FARGO BANK N.A. TRUST

COMPANY, AS TRUSTEE Enterprise's scam, to hold the entities and

individuals who run and profit from the Enterprise accountable, and to

provide redress for the injuries to consumers that the Enterprise has

caused.

## II. JURISDICTION AND VENUE

**1.** This Court has subject matter jurisdiction pursuant to 28

U.S.C. §§ 1331, 1337(a), and 1345.

**2.** The Court has original and subject matter jurisdiction over

The Plaintiffs' statutory and common law violations of RICO, South

Carolina, and common law.

**3.** Venue is proper in this District under 28 U.S.C. §

1391(b)(1),(b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b)

**4.** Venue is proper in this Judicial District as the Plaintiffs'

property is located in Richland County, South Carolina. Defendants have

conducted business, albeit illegally in this County and throughout the one

hundred twenty (120) Counties in South Carolina and throughout the

United States by filing tens of thousands of fabricated, illegal and

unenforceable Promissory Notes, Assignments of Promissory Notes,

Affidavits as to loan ownership and Status of Accounts, Mortgages and

Assignments of Mortgages.

## III. INTRODUCTION

**5.** This case arises due to the fact that Plaintiffs and their. Mortgages and in some cases, the foreclosures that followed, were and will be based upon a mortgage and a note in the mortgage that are not held by the same entity or party and are based upon a mortgage that was flawed at the date of origination of the loan because Mortgage Electronic Registration Systems ("MERS") was named as the beneficiary or nominee of the lender on the mortgage or an assignee and because the naming of MERS as the beneficiary was done for the purpose of deception, fraud, harming the borrower and the theft of revenue from in all one hundred (120) South Carolina Counties through the illegal avoidance of mortgage recording fees.

**6.** CURTIS SHEPHERD is a married couple who own a home in the County of Orange Burg . At the time a foreclosure was filed, the CURTIS   SHEPHERD believed they were in the process of a H.A.M.P. Loan modification and were fraudulently led to believe that WELLS FARGO BANK  N.A. Trust Servicing was the owner of their loan. The CURTIS SHEPHERD property is currently in litigation. WELLS FARGO BANK  N.A. Trust, Following termination of WELLS FARGO BANK  N.A. Trust status as a REIT, Trust WELLS FARGO BANK, NA Failures to comply with Pooling and Servicing Agreement as Bank Custodian. Cut-Off Date: June 1, 2005, Mortgage, the owner of the CURTIS SHEPHERD loan remains unknown.

**SHEPHERD**

---



**WELLS FARGO BANK, FAILURE TO COMPLY WITH POOLING AND SERVING AGREEMENT AS BANK CUSTODIAN. CUT -OFF DATE June 1, 2005.**

**-No Promissory Note.**

Section 10.01 <u>Termination upon Liquidation or Purchase of All Mortgage Loans</u>.

(a) The obligations and responsibilities of the Depositor, the Transferor, the Master Servicer, the Trust Administrator and the Trustee created hereby with respect to the Trust Fund shall terminate upon the earlier of (i) the purchase, in accordance with this Section 10.01, of all Mortgage Loans (and REO Properties) remaining in the Trust Fund at the price equal to the sum of (x) the aggregate Clean-up Call Mortgage Loan Price for all the Mortgage Loans and (y) the aggregate Clean-up Call REO Property Price for all the REO Properties, and (ii) the later of (x) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and the disposition of all REO Property and (y) the distribution to the Holders of the Certificates and the Class 1-A-3 Insurer of all amounts required to be distributed to them pursuant to this Agreement. In no event shall the trusts created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James's, living on the date hereof and (ii) the Latest Possible Maturity Date. The right of the Master Servicer to elect to exercise its termination rights pursuant to this clause (a) shall be conditioned upon the Aggregate Pool Principal Balance, at the time of any such repurchase, aggregating less than ten percent (10%) of the aggregate Cut-off Date Principal Balance of the Mortgage Loans.

(b) Within two (2) Business Days after the Master Servicer has elected to exercise its termination rights pursuant to Section 10.01(a), the Master Servicer shall deliver a bid notice for the Mortgage Loans and the REO Properties to UBS Securities LLC and at least two other institutions that are regular purchasers and/or sellers in the secondary market of residential whole Mortgage Loans. The bid notice shall specify the Mortgage Loans and the REO Properties that are being sold, and identify

the aggregate Clean-up Call REO Property Price required to be paid for the REO Properties and the other information necessary for the bidders to make bids.  The Master Servicer shall also be entitled to submit a bid for the Mortgage Loans and the REO Properties.  All bids must be submitted to the Master Servicer on a date determined by the Master Servicer, which date shall be set forth in the bid notice.  Only cash bids may be accepted.  With respect to the Mortgage Loans to be purchased, if one or more bids that exceed the aggregate Par Call Price are received, the Fair Market Value Call Price for the Mortgage Loans shall be equal to the price bid by the highest bidder, and such bidder shall complete the purchase of the Mortgage Loans and the REO Properties from the Trust Fund at the aggregate Clean-up Call Mortgage Loan Price for the Mortgage Loans and the aggregate Clean-up Call REO Property Price for the REO Properties before the final Distribution Date. With respect to the Mortgage Loans to be purchased, if fewer than three bids are received or no bid exceeds the aggregate of the Par Call Price for the Mortgage Loans, the Fair Market Value Call Price shall be zero and the Master Servicer shall complete the purchase of the Mortgage Loans and the REO Properties from the Trust Fund at the aggregate Clean-up Call Mortgage Loan Price for the Mortgage Loans and the aggregate Clean-up Call REO Property Price for the REO Properties before the final Distribution Date.

## -Fraud Upon This Court

1. Who is an "officer of the court"?

**7.** A judge is an officer of the court, as well as are all attorneys. A state judge is a state judicial officer, paid by the State to act impartially and lawfully. A federal judge is a federal judicial officer, paid by the federal government to act impartially and lawfully. State and federal attorneys fall into the same general category and must meet the same requirements. A judge is not the court. People v. Zajic, 88 Ill.App.3d 477, 410 N.E.2d 626 (1980).

2. What is "fraud on the court"?

**8.** Whenever any officer of the court commits fraud during a proceeding in the court, he/she is engaged in "fraud upon the court". In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

**9.**    "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. The 7th Circuit further stated "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final." 3, What effect does an act of "fraud upon the court" have upon the court proceeding?

**10.**    "Fraud upon the court" makes void the orders and judgments of that court. It is also clear and well-settled Illinois law that any attempt to commit "fraud upon the court" vitiates the entire proceeding. The People of the State of Illinois v. Fred E. Sterling, 357 Ill. 354; 192 N.E. 229

(1934) ("The maxim that fraud vitiates every transaction into which it enters applies to judgments as well as to contracts and other transactions."); Allen F. Moore v. Stanley F. Sievers, 336 Ill. 316; 168 N.E. 259 (1929) ("The maxim that fraud vitiates every transaction into which it enters ..."); In re Village of Willowbrook, 37 Ill.App.2d 393 (1962) ("It is axiomatic that fraud vitiates everything."); Dunham v. Dunham, 57 Ill.App. 475 (1894), affirmed 162 Ill. 589 (1896); Skelly Oil Co. v. Universal Oil Products Co., 338 Ill.App. 79, 86 N.E.2d 875, 883-4 (1949); Thomas Stasel v. The American Home Security Corporation, 362 Ill. 350; 199 N.E. 798 (1935). Under Illinois and Federal law, when any officer of the court has committed "fraud upon the court", the orders and judgment of that court are void, of no legal force or effect.

4.    What causes the "Disqualification of Judges?"

**11.**    Federal law requires the automatic disqualification of a Federal judge under certain circumstances.

**12.**    In 1994, the U.S. Supreme Court held that "Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified." [Emphasis added]. Liteky v. U.S., 114 S.Ct. 1147, 1162 (1994).

**13.** Courts have repeatedly held that positive proof of the partiality of a judge is not a requirement, only the appearance of partiality. Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 108 S.Ct. 2194 (1988) (what matters is not the reality of bias or prejudice but its appearance); United States v. Balistrieri, 779 F.2d 1191 (7th Cir. 1985) (Section 455(a) "is directed against the appearance of partiality, whether or not the judge is actually biased.") ("Section 455(a) of the Judicial Code, 28 U.S.C. §455(a), is not intended to protect litigants from actual bias in their judge but rather to promote public confidence in the impartiality of the judicial process.").

**14.** That Court also stated that Section 455(a) "requires a judge to recuse himself in any proceeding in which her impartiality might reasonably be questioned." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989). In Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972), the Court stated that "It is important that the litigant not only actually receive justice, but that he believes that he has received justice.

**15.** " The Supreme Court has ruled and has reaffirmed the principle that "justice must satisfy the appearance of justice", Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954). A judge receiving a bribe from an interested party over which he is presiding, does not give the appearance of justice.

**16.**         "Recusal under Section 455 is self-executing; a party need not file affidavits in support of recusal and the judge is obligated to recuse herself sua sponte under the stated circumstances." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989).

**17.**         Further, the judge has a legal duty to disqualify himself even if there is no motion asking for his disqualification. The Seventh Circuit Court of Appeals further stated that "We think that this language [455(a)] imposes a duty on the judge to act sua sponte, even if no motion or affidavit is filed." Balistreri, at 1202.

**18.**         Judges do not have discretion not to disqualify themselves. By law, they are bound to follow the law. Should a judge not disqualify himself as required by law, then the judge has given another example of his "appearance of partiality" which, possibly, further disqualifies the judge.

**19.**         Should another judge not accept the disqualification of the judge, then the second judge has evidenced an "appearance of partiality" and has possibly disqualified himself/herself. None of the orders issued by any judge who has been disqualified by law would appear to be valid. It would appear that they are void as a matter of law, and are of no legal force or effect.

**20.**         Should a judge not disqualify himself, then the judge is violation of the Due Process Clause of the U.S. Constitution. United

States v. Sciuto, 521 F.2d 842, 845 (7th Cir. 1996) ("The right to a tribunal free from bias or prejudice is based, not on section 144, but on the Due Process Clause.").

**21.**         Should a judge issue any order after he has been disqualified by law, and if the party has been denied of any of his / her property, then the judge may have been engaged in the Federal Crime of "Interference with interstate commerce". The judge has acted in the judge's personal capacity and not in the judge's judicial capacity. It has been said that this judge, acting in this manner, has no more lawful authority than someone's next-door neighbor (provided that he is not a judge). However, some judges may not follow the law.

**22.**     If you were a non-represented litigant, and should the court not follow the law as to non-represented litigants, then the judge has expressed an "appearance of partiality" and, under the law, it would seem that he/she has disqualified him/herself.

**23.**     However, since not all judges keep up to date in the law, and since not all judges follow the law, it is possible that a judge may not know the ruling of the U.S. Supreme Court and the other courts on this subject. Notice that it states "disqualification is required" and that a judge "Must be disqualified" under certain circumstances.

**24.**         The Supreme Court has also held that if a judge wars against the Constitution, or" if he acts without jurisdiction, he has

engaged in treason to the Constitution. If a judge acts after he has been automatically disqualified by law, then he is acting without jurisdiction, and that suggest that he is then engaging in criminal acts of treason, and may be engaged in extortion and the interference with interstate commerce.

**25.**    Courts have repeatedly ruled that judge have no immunity for their criminal acts. Since both treason and the interference with interstate commerce are criminal acts, no judge has immunity to engage in such acts subject matter jurisdiction and amount in controversy S.C. Code Ann. §§ 22-3-10, and 22-3-20. Section 22-3-10, as limited by § 22-3-20, SECTION 22-3-30

**26.**    1. Actions on contracts for the recovery of money, where the claim does not exceed $7,500.00;

**27.**    2. Actions for damages for injury to rights pertaining to the person, or personal or real property, where the damages do not exceed $7,500.00;

**28.**    3. Actions for a penalty, fine or forfeiture, not to Exceed $7,500.00;

**29.**    4. Actions commenced by attachment of property, as provided by statute, where debt or damages do not exceed $7,500.00;

24.    5. Actions upon a bond conditioned for the payment of money, not exceeding $7,500.00, whether the money is due in sum total or in installments;

**30.**        6. Actions upon a surety bond taken by the magistrate, when penalty or amount claimed does not exceed $7,500.00;

**31.**        7. Actions upon a judgment rendered in magistrate's court When it is not prohibited by the South Carolina Rules of Civil Procedure;

**32.**        8. Taking and entering judgment on the confession of a defendant in the manner prescribed by law when the amount confessed does not exceed $7,500.00.

**33.**        9. Actions for damages or for fraud in the sale, purchase, Or exchange of personal property, not to exceed $7,500.00;

**34.**        10. All landlord and tenant matters, as well as those included in Chapter 33 through 41 of Title 27, encompassing matters of leasehold estates, rent, ejectment of tenants and undertenants of life tenants;

**35.**        11. Actions to recover the possession of personal property, whose stated value does not exceed $7,500.00;

**36.**        12. In all actions provided for in this section when a filed counterclaim involves a sum not exceeding $7,500.00.

**37.**        13. In interpleader actions arising from real estate contracts for the recovery of earnest money, only if the sum claimed does not exceed $7,500.00

**38.**     **<u>"Fraud upon the court"</u>** has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud

which does, or attempts to, defile the court itself, or is a fraud
perpetrated by officers of the court so that the judicial
machinery cannot perform in the usual manner its impartial
task of adjudging cases that are presented for adjudication."
Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal
Practice, 2d ed., p. 512, ¶ 60.23. The 7th Circuit further stated
"a decision produced by fraud upon the court is not in essence
a decision at all, and never becomes final."

## II. THE DEFENDANTS

Mortgage Electronic Registration Systems, Inc., MERSCORP, hereinafter

collectively ("MERS") and the MERS Shareholders:

**39.**    Defendant Merscorp, Inc., is a foreign corporation created

in or about 1998 by conspirators from the largest banks in the United

States in order to undermine and eventually eviscerate long-standing

principles of real property law, such as the requirement that any person or

entity who seeks to foreclose upon a parcel of real property: 1) be in

possession of the original note, 2) Have a publicly recorded mortgage in

the name of the party for whom the underlying debt is actually owed and

who is the holder of the original Promissory Note with legally binding

assignments, and 3) possess a written assignment giving he, she or it

actual rights to the Payments due from the borrower pursuant to both the

mortgage and note.

**40.**    Defendant Merscorp, Inc., claims to be the sole

shareholder in an entity by the name of Mortgage Electronic Registrations

Systems, Inc., ("MERS"). MERS is the RICO enterprise and is the primary

innovation through which the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint.

41.     For the purposes of this action, MERS shall also refer to Each and every shareholder of MERSCORP, who will be named as their identities are revealed.

42.     The Complaint names the entity, Mortgage Electronic Registration Systems, Inc., hereinafter, ("MERS"). MERS is the mortgage holder of record for the Plaintiff's second mortgage. The lender to the second mortgage is WELLS FARGO BANK N.A. TRUST COMPANY, as It is this second mortgage, which is the subject of this action.

43.     MERS is not the original lender for any of the loans. MERS is not the creditor, beneficiary of the underlying debt or an assignee under the terms of the Promissory Notes of the Plaintiffs. MERS does not hold the original of the Promissory Note, nor has it ever held the Promissory Notes of the Plaintiffs. Property.

44.     The Mortgagee, MERS, is a owned by the company, MERSCORP, which is in turn owned by a group of Wall Street investment Banks.

45.     MERS is unregistered and unlicensed to conduct mortgage lending or any other type of business in the State of South Carolina and has been and continues to knowingly and intentionally illegally and fraudulently record mortgages and conduct business in South Carolina

on a large scale and systematic fashion.

**46.**    No promissory Note or other evidence exists which could Ever make the Plaintiffs and the indebted to MERS in any way.

**47.**    MERS never had nor will it ever have standing to enforce The illegal and fraudulent mortgage it filed against the properties in question. MERS never had nor will it ever have the authority to assign the Mortgage to any entity.

**48.**    MERS has never possessed a pecuniary or financial interest in the Notes of the Plaintiffs.

**49.**    MERS has never had any right to collect on the Note or Enforce the Mortgage, nor has it had a right to hold, enforce or collect upon any of the thousands of Mortgages it has fraudulently recorded throughout the State of South Carolina, in the 50 states, the County of Richland and all other US Territories.

## **The Law Firms:**

**50.**    In or about the last decade, the Defendant Firms joined With Defendant Merscorp, Inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained. . The employees of the Defendant Firms, including many licensed attorneys, have become skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to accomplish illegal acts.

51.     This action includes PLAINTIFFS from each and every Federal jurisdiction, whether or not the individual state allows the foreclosure of the homes in its state without the owner of the home ever having the opportunity to defend itself in a Court of law, (the non-judicial foreclosure states.) Therefore, for purposes of this action the term "Mortgage" shall include the term "Deed of Trust."

52.     The "lender," on the original Promissory Note was not the lender. The originators of the loan immediately and simultaneously securitized the note. The beneficial interest in the note was never in the lender. MERS, acting as the mortgagee or mortgage assignee, was never intended to be the lender nor did it represent the true lender of the funds for the mortgage. ███████████████████████ ████████████████████████████ or some party has or is about to declare the default, is not in privity with the lender. The true owner or beneficiary of the mortgage loan has not declared a default and usually no longer have an interest in the note. The Servicer is not in privity nor does it have the permission of the beneficial owners of the Note to file suit on their. behalf.

53.     The obligations reflected by the note allegedly secured by the MERS mortgage have been satisfied in whole or in part because the investors who furnished the funding for these loans have been paid to the degree that extinguishment of the debts has occurred with the result that

there exist no obligations on which to base any foreclosure on the property owned by the Plaintiffs. Defendants have and will cloud the title and illegally collect payments and attempt to foreclose upon the property of the Plaintiffs when they do not have lawful rights to foreclose, are not holders in due course of the notes.

54.     Any mortgage loan with a Mortgage recorded in the name Of MERS, is at most, an unsecured debt. The only parties entitled to collect on the unsecured debt would be the holders in due and beneficial owners of the original Promissory Note.

55.     The loan agreements were predatory and the Defendants Made false representations to the Plaintiffs which induced the Plaintiffs to enter into the loans and the Defendants knew the representations were false when they were made.

56.     This is a Case brought for violations of South Carolina And Federal law. It is brought by Plaintiff's mortgagors who have been sued for either in foreclosure or Declaratory Judgments for Truth in Lending Act ("TILA") Regulation Z Rescissions, by entities lacking capacity (fake Trusts), to file suit in South Carolina and who lack standing as a real party in interest to the underlying debt; which would exist in the form of a negotiable instrument, a Promissory Note. The Plaintiffs also consist of any and all mortgagors in the state of South Carolina whose mortgages are or were ever publicly recorded in the name of MERS, regardless of

whether there is a suit in foreclosure against the property.

57.    Although the loan transactions in question contain dozens Of violations of federal and state statutes and common law torts, which have been perpetrated against South Carolina recording clerks, the South Carolina Revenue Cabinet and property owners, this concerns to violations of law pertaining to the improper and illegal drafting, execution and public recording of Affidavits, Mortgages and Assignment of Mortgages used to illegally divest and the continued illegal attempts to divest property owners of title to their property.

58.    In addition to damages, the violations have created and continue to create a permanent cloud on South Carolina and nationwide titles and land records in relation to the titles illegally divested. This cloud potentially affects every resident of South Carolina and the United States as all have the potential to be the title holders of the clouded property.

59.    Since 2007, and going forward, many properties owners Found themselves defending a foreclosure action during the pendency of a Declaratory action to loan rescission under TILA's Regulation Z. Often, the Declaratory Judgment and Foreclosure would be filed by different parties. Other property owners found themselves served with a foreclosure action while in the middle of a loan modification with an entity they were led to believe was a bank and their lender. Others were foreclosed upon due to an involuntary default due to a substantial and insurmountable increase in

their adjustable rate mortgage. While still others were foreclosed during a voluntary default made at the request of a loan Servicer, whom the borrower believed to be a Bank and their lender. This was a lie. These voluntary defaults were obtained by the third-party loan Servicer under the guise that the voluntary 60-day default was necessary in order for the homeowner to qualify for a government sponsored loan modification program.

60.     The property owners find that they have been sued in Declaratory Judgment and/or foreclosure by a third-party Loan Servicing Agent for "Trustee for the _____Trust" or by a fourth party Sub-Servicer. The Servicers have absolutely no legal rights or legal connection to the mortgage loan. In other cases, the "Trust" themselves will come to Court.

61.     The pattern and practice of the Servicers, MBS Trusts, The document processing companies and law firms was to procure fraudulent and forged documents for the sole purpose of creating a fraud in the public record in order to illegally take property in foreclosure.

62.     Certain individuals who were the employees of the Servicer, document processing company and even the employees of the law firms executed and notarized forged documents as to the ownership of the loan. The affiants have committed widespread and counts of fraud, perjury and forgery in the tens of thousands. These forgers have been

referred in the press with the vernacular term "robo-signers."

**63.**    In these cases, the property could be foreclosed by Default, sold and transferred without ANY real party in interest havening ever come to Court and without the name of the "Trust" or the owners of the mortgage loan, ever having been revealed. Many times, the Servicer will fraudulently keep the proceeds of the foreclosure sale under the terms of a Pooling and Servicing Agreement as the "Trust" no longer exists or has been paid off. The Court and the property owner will never know that the property was literally stolen.

**64.**    After the property is disposed of in foreclosure, the real Owners of the mortgage loan are still free to come to Court and lay claim to the mortgage loan for a second time. These parties who may actually be owed money on the loan are now also the victims of the illegal foreclosure. The purchaser of the property in foreclosure has a bogus and clouded title, as well as all other unsuspecting buyers down the line. Title Insurance would be impossible to write on the property.

**65.**    The "Trusts" coming to Court are actually Mortgage-Backed Securities ("MBS"). The Servicers, like PHH Mortgage Corporation ("PHH"), are merely administrative entities which collect the mortgage payments and escrow funds. The MBS have signed themselves up under oath with the Securities and Exchange Commission ("SEC,") and the Internal Revenue Service ("IRS,") as mortgage asset "pass through"

entities wherein they can never own the mortgage loan assets in the MBS. This allows them to qualify as a Real Estate Mortgage Investment Conduit ("REMIC") rather than an ordinary Real Estate Investment Trust ("REIT"). As long as the MBS is a qualified REMIC, no income tax will be charged to the MBS. For purposes of this action, "Trust" and MBS are interchangeable.

## Real Estate Mortgage Investment Conduit (REMIC):

**66.** Although the Defendants attempting to foreclosure refer To themselves as "Trustees" of a "Trust," the entities are not "Trustees" nor "Trusts" as defined by South Carolina law. Neither are the entities registered as Business Trusts or Business Trustees as required by South Carolina law. In every case, where one of these MBS have come to a South Carolina Court the entity foreclosing lacked capacity sue to file suit in the State of South Carolina. There is no "Trust Agreement" in existence. The entity filing has utilized a South Carolina legal term it has no right to use for the sole purpose of misleading the Court.

**67.** Although the "Trust" listed may be registered with the Securities and Exchange Commission ("SEC") and the Internal Revenue Service ("IRS") as a Real Estate Mortgage Investment Conduit ("REMIC"), more often than it is not properly registered in any state of the union as a Corporation, Business Trust, or any other type of corporate entity. Therefore, the REMIC does not legally exist for purposes of capacity for

filing a law suit in South Carolina or any other State.

**68.**    REMICS were newly invented in 1987 as a tax avoidance measure by Investment Banks. To file as a REMIC, and in order to avoid one hundred percent (100%) taxation by the IRS and the Kentucky Revenue Cabinet, an MBS REMIC could not engage in any prohibited action. The "Trustee" cannot own the assets of the REMIC. A REMIC Trustee could never claim it owned a mortgage loan. Hence, it can never be the owner of a mortgage loan

**69.**    Additionally, and important to the issues presented with This particular action, is the fact that in order to keep its tax status and to fund the "Trust" and legally collect money from investors, who bought into the REMIC, the "Trustee" or the more properly named, Custodian of the REMIC, had to have possession of ALL the original blue ink Promissory Notes and original allonges and assignments of the Notes, showing a complete paper chain of title.

**70.**    Most importantly for this action, the "Trustee"/Custodian MUST have the mortgages recorded in the investors name as the beneficiaries of a MBS in the year the MBS "closed." Every mortgage in the MBS should have been publicly recorded in the Richland County where the property was located with a mortgage in the name similar to "2006 ABC REMIC Trust on behalf of the beneficiaries of the 2006 ABC REMIC Trust." The mortgages in the referenced example would all have had to been

publicly recorded in the year 2006.

71.    As previously pointed out, the "Trusts" were never set up Or registered as Trusts. The Promissory Notes were never obtained and the mortgages never obtained or recorded.

72.    The "Trust" engaged in a plethora of "prohibited activities" And sold the investors certificates and Bonds with phantom mortgage-backed assets. There are now nationwide, numerous Class actions filed by the beneficiaries (the owners/investors) of the "Trusts" against the entities who sold the investments as REMICS based on a bogus prospectus.



74.    As applied to the Plaintiffs in this action, the end result would be that the required MBS asset, or any part thereof (mortgage note or security interest), would not have been legally transferred to the trust to allow the trust to ever even be considered a "holder" of a mortgage loan. Neither the "Trust" or the Servicer would ever be entitled to bring a foreclosure or declaratory action. The Trust will never have standing or be a real party in interest. They will never be the proper party to appear before the Court. The transfer of mortgage loans into the trust after the "cutoff

date" (in the example 2006), destroys the trust's REMIC tax exempt status, and these "Trusts" (and potentially the financial entities who created them) would owe millions of dollars to the IRS and the South Carolina Revenue Cabinet as the income would be taxed at of one hundred percent (100%).

75.    Subsequent to the "cutoff date" listed in the prospectus, whereby the mortgage notes and security for these notes had to be identified, and Note and Mortgages transferred, and thereafter, the pool is permanently closed to future transfers of mortgage assets.

76.    The Plaintiffs have mortgage loans which were recorded in the name of MERS and/or for which were attempted through a Mortgage Assignment to be transferred into a REMIC after that REMIC's "cut off" and "Closing- dates."

77.    If an MBS Trust was audited by the IRS and was found to Have violated any of the REMIC requirements, it would lose its REMIC status and all back taxes would be due and owing to the IRS as well as the state of South Carolina. As previously stated, one hundred percent (100%) of the income will be taxed.

78.    As the Plaintiffs are identified and the identity of the MBS REMICs revealed through this action, the individual "Trusts"/ MBS REMICs will be turned over to the IRS for auditing.

79.    Upon information and belief, it is asserted that the IRS is Aware that a list of alleged "unqualified" REMICs is forthcoming through the

identity of the Plaintiffs mortgage loan "Trusts" in this action.

## Securitization and Standing:

**80.**    To the judges throughout South Carolina.  and to the homeowners, the foreclosing Plaintiffs, a servicing company or "Trust" entity appears to be a bank or lender. This falsity is due to its name in the style of the case. They are not banks or lenders to the loan. They are not a beneficiaries under the loan. They do not possess a Mortgage in the property. They will never have a right to possess a mortgage in the property. It would have been a more honest representation for the foreclosing entity to called itself something like "Billy Bob's Bill Collectors,"

**81.**    In such cases, the "trustee" filing the foreclosure complaint is not known to the homeowner. The very first time the homeowners learn that their home was put up as collateral for a publicly traded and sold home loan REMIC (a federally regulated Security) is at the time they are served with a foreclosure complaint.

**82.**    These "trusts" are actually Mortgage-Backed Securities (MBS). An MBS is an investment vehicle, defined and regulated as "Security" by the Security and Exchange Commission (SEC.)

**83.**    At the time the homeowners signed a Promissory Note and Mortgage, they were unknowingly converting their property into an asset of an MBS. The homeowners were never informed of the nature of the scheme. They were deliberately induced into signing a Negotiable

Instrument which was never intended as such, but was intended as collateral for an MBS.

84.    The fact that the loan was meant to fund a MBS was a "material disclosure" which was deliberately and intentionally undisclosed. The failure to disclose the identity of the true lender at closing was also a "Material disclosure;" the nature of which would make the contract voidable under South Carolina contract law.

85.    From the time of the Great Depression up and until 1999, The conversion of loans into MBS was illegal. The Banking Act of 1933 established the Federal Deposit Insurance Corporation (FDIC) in the United States and introduced banking reforms, some of which were designed to control speculation of the exact nature of what has taken place in the last several years. It was commonly known as the Glass– Steagall Act. Over the years provisions of the Act were eroded little by little, until the Act was finally killed with the last repeal of the section which prohibited a bank holding company from owning other financial companies. This was accomplished with the Gramm–Leach Act.

86.    The repeal of the Glass-Steagall Act of 1933 effectively removed the separation that previously existed between Wall Street investment banks and depository banks and has been blamed for creating the damage caused by the collapse of the subprime mortgage market that led to the financial crisis of 2008–present day. The repeal opened the door

for an interpretation which would supposedly allow securitization of mortgage loans. This interpretation has yet to be challenged, is ripe for such, but must be left for another day.

87.     Mostly beginning in 2004, hundreds of thousands of Residential mortgages were bundled together (often in groups of 5,000 mortgages), and investors were offered the opportunity to buy shares of each bundle, an MBS. Some of the bundles were offered as Bond Certificates, guaranteeing a rate of return. Many of these Bond MBS were funded by large private and governmental pension funds and in some cases, as the case with Greece, by foreign governments

88.     Investments were made in the MBS, based on a prospectus, which had to be filed with the SEC. The MBS would always be rated "AAA" by Moody's or Standard & Poor's in order to invoke a sense of confidence for the investors. The rating agencies were hired and compensated by the underwriter/salesman of the MBS. The rating Agencies are currently under investigation by the Justice Department for their role in the financial meltdown.

89.     The prospectus was created, the MBS rated and the Investor's money was pledged and collected long before the homeowner ever even applied for a loan.

90.     In other words, the MBS was created first. The loans fitting the description of those found in the prospectus had to then be

created and originated. Each MBS/Trust was required to keep a list of the individual loans they had allegedly recruited for the MBS. This list has to be publicly recorded with the SEC. However, the SEC did not require any proof that the loans actually existed or were possessed by the MBS. For the tax man and in order to qualify as a REMIC, the Notes and mortgages listed with the SEC had to be held, and mortgages recorded ON THE DATE THE MBS CLOSED.

**91.** Each such MBS bundle was given a name, such as "ABC Home Loan Trust 2006 ABC-8." The name indicates information about the particular trust, such as the year it was created and closed and its reference name and number for the SEC and IRS.

**92.** As required by the SEC, each MBS/Trust has a Pooling And Servicing Agreement ("PSA") which must be publicly filed. The only purpose for the PSA is for the administration and distribution of funds to the investors and the obligation of the so-called Trustee in administering the MBS. The investors who put up the money for the MBS and who received the MBS Certificates or Bonds, are not parties to the PSA.

**93.** The PSA merely sets forth what happens after the Mortgages are bundled together. However, the PSA also sets forth a Cut Off Date. The Cut Off Date is the date on which all mortgage loans in the MBS/Trust must be identified and set out in the SEC required list of mortgage loans. Often, these loans were identified and listed for the SEC

and the investors, regardless of whether the loan existed or had been closed. Some loans were listed in SEC filings in multiple MBS.

**94.** Like the Cut Off Date, each MBS/Trust had a Closing Date. The Closing Date is the date that the individual identified mortgages were to be transferred through the Custodian for the benefit of the investors. The Trust Custodian must certify that for each mortgage loan, the Trust Custodian has possession of the original Promissory Note, all original endorsements and assignments transferring the Note and proof that the ownership of the Note has been transferred for the benefit of the shareholder/investors. Further proof of the ownership of a mortgage loan is required by a public recording of the Mortgage or Assignment of the Mortgage itself. This MUST have occurred by the closing date.

**95.** The Servicers worked to collect money for the MBS from The individual loans and collected and distributed escrow funds. The "Trustees" were Custodians, akin to administrators.

**96.** Typically, and contrary to South Carolina law, the Trust Would include equivalent language regarding the handling of these required Assignments: "Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan." This publicly recorded provision to deliberately keep the transfers

out of the public record, violates the Mortgage recording Statute of almost every State of the Union

**97.**    While attempting to circumvent South Carolina recording Statutes, the MBS Trust created for itself a situation wherein it had no legally recognizable interest in the loans for the benefit of the investors. The investors were invested in nothing. The MBS possessed nothing on the date the REMIC closed and perpetrated a fraud on the investors and the American taxpayer through its fraudulent qualification as a REMIC with the SEC

**98.** 

**100.**    More often than not, the statement that the foreclosing Entity "holds" the original Promissory Note is an untruth. The majority of the securitized Notes no longer exist, having been deliberately destroyed or disposed. At the time the feeding frenzy of securitization occurred (mostly between 2004 and 2008,) paperwork was of little consequence as the goal

of the originators was to fill and securitize as many loans as possible in order to create the loan number list for the SEC. Likewise, whether or not the loans were ever repaid was of absolutely no consequence as the Servicers and "Trusts" had nothing to lose; the loans having been funded by the investors and were insured by multiple derivative contracts.

 Often, and contrary to South Carolina law,

**102.**    In addition, in order to make the Cut Off date to fill the SEC required loan number list, the appraisals for the loan were deliberately inflated as many of the investor Prospectus stated that all the loans in the bundle met certain criteria, including and most significantly specific loan to value ratios.

**103.**    When the scheme was originated and implemented en Mass (Mostly between the years 2004 and 2007), what was not planned for or counted upon was the immediate 2008 massive real estate market collapse and the thousands of voluntary and involuntary defaults and TILA loan rescissions of mortgage loans. At the same time, the fair market value of housing dropped by as much as fifty percent (50%) in some parts of the

country.



**105.** Most importantly for South Carolina foreclosures and Declaratory actions, the investors or beneficiaries did not have contracts with the Trusts, Servicers, or Trustees to act on their behalf in a law suit in foreclosure or otherwise.

**106.** In order to collect on the mortgage loans and divest Americans of their homes, Servicers and "Trustees" have had to mislead the Courts as to their standing in foreclosure. They have had to create, forge and fabricate phony documents in order to obtain an Order of Sale in Foreclosure.

## The Creation and Use of Fraudulent Affidavits and Mortgage Assignments:

**107.** In a foreclosure, the MBS/Trustee claims to be acting on Behalf of the MBS/Trust and claims that it has acquired the loan from the originator. The multiple transfers of title of the mortgage loan in between the originator and the MBS/Trust is simply ignored as it can never be proved or shown to the Court. As previously stated, when a Servicer is foreclosing, an additional break in the chain occurs as the Servicer is often

never the mortgagee of record under a Mortgage Assignment and has absolutely no legal tie to the investors in the MBS. The "Trust" or Servicer can never hold or transfer a Mortgage in the property on behalf of the investors.

**108.**    In these cases, the originator LENDER IndyMac Bank, F.S.B is no longer in business and/or has been dissolved in bankruptcy. The MBS/Trustee never mentions the intervening transfers to the other parties or the shareholder/investors or to the Court. The MBS/Trustee never proves that such transfers lawfully occurred.

**109.**    In the rush to create these trusts and sell shares to investors as fast and in as large a quantity as possible, the loans, Mortgages and Assignments were never prepared, filed or recorded. This means that the entity seeking to foreclose can NEVER prove the chain of ownership. When a Servicer shows up in a South Carolina, **STATE OF SOUTH CAROLINA COUNTY OF ORANGEBURG IN THE COURT OF COMMON PLEA,** Are Defendants in  **Civil Action #: CASE NO: 14-CP-38-0094-** filed in this Court 18 U.S. Code § 1345 – Injunctions against fraud Division through Fraud, Circuit Court, it is even one more step removed from the ownership of the underlying debt and Mortgage and would NEVER have an ownership claim. The Homeowner has no idea that it is making payments to, corresponding with and applying for a modification with a mortgage loan servicer instead of a mortgage loan owner or that the Servicer is keeping part or all of proceeds of the mortgage payments

without the knowledge or permission of the investors.

110.   In Wall Street's massive feeding frenzy and rush to transform Notes and Mortgages (negotiable instruments) into asset-backed securities, the necessary documents were never prepared or executed from the original lender to the MBS originator, to the Depositor to the Underwriter through the Securitized MBS/Trust to the only possible beneficiaries under the loans, the shareholder/investors.

111.   MBS/Trustees and their lawyers discovered in the Foreclosure process that the Note and Mortgage Assignments would never be located because they never existed. They also discovered that states did no allow blank Assignments or Assignments with retroactive effective dates. To solve the problem of the missing and non-existent Assignments, the MBS/Trustees, their attorneys and their Servicing Agents, decided to fabricate Assignments from thin air and then quietly record the fabricated Assignments. If a Promissory Note Assignment is presented to the Court, it deliberately do not state the date the promissory Note was assigned. It was procured after the fact and is based in fraud and in violation of MBS Trusts' tax status requirements. The dateless Promissory Note Assignment or allonge is then affixed to a copy of the Promissory Note as the original Promissory Note simply does not exist. ████████████████████████
████████████ ███████████████████████████████████████████████.

112.   The Assignments of the Mortgage were signed and

Notarized many years after the actual date of the loan and the date listed

with the SEC and IRS as the "Closing" of the REMIC. In every one of these

cases, the MBS Trust has been operating illegally as a tax-exempt REMIC.

The federal government is in turn, owed billions of dollars in income tax

from these entities. The individual states of the union have causes of action

on behalf of their citizens for the unpaid state tax.

113.    Incredibly, most times, the Mortgage Assignments are

Dated after the filing of the foreclosure. Most foreclosures are filed without

an Assignment at all and the Mortgage attached as the Exhibit is in the

name of the original lender or a third nominal party like Mortgage Electron

Registration Systems, Inc. ("MERS".) The

114.    The fabricated Assignments were prepared by specially

selected law firms and companies that solely specialized in providing

"Mortgage default services" to the MBS/Trusts and their Servicers. In South

Carolina, it is estimated that over ninety percent (90%) of the filed

Mortgage Assignments in the last three years were prepared, fabricated,

and filed by the same five or six law firms and default processing

companies.

115.    In most cases, the Note and Mortgage were severed or

bifurcated at the closing table with the Mortgage being recorded in the

name of MERS as "nominee" for the original lender. However, the original

lender never actually loaned any money to the homeowner. The original

lender was never owed or paid any money under the terms of the Note. There the Mortgage sat for years in the name of an entity, MERS, for which the homeowner owed no money and which would never be beneficiary under the Note. As previously set out, often the MERS held the Mortgage as "nominee" for a lender who was out of business and/or liquidated in bankruptcy. There could be no party legally able to Assign the Mortgage on behalf of the dissolved lender. The only party who could authorize the Mortgage Assignment for a bankrupt lender would be the Bankruptcy Trustee. In these cases where a MERS mortgage has been assigned on behalf of a bankrupt entity, a criminal violation of the bankruptcy code had occurred.

116.    When MERS did not appear as the original Mortgagee, Two such Assignments had to be prepared, executed and filed by the " Trust," its Servicer, a document processing company and/or a foreclosure mill law firm. The first was prepared in the name of MERS from the original lender; who as previously stated, may be extinct or bankrupt. A second bogus Assignment would then have to prepared and filed wherein an agent and sometimes an employee for the entity filing the foreclosure, or an employee of the law firm which filed the foreclosure, would forge the name of or hold themselves out as a Vice-President or executive of MERS. By drafting, Executing and notarizing the Affidavit or Mortgage Assignment, the forger claimed that they had Mortgage Assignment authority for both MERS and the extinct original lender.

**117.**    An Assignment from MERS was a legal nullity. MERS Never had an interest in the Note or Mortgage.

**118.**    Often, the foreclosure mill law firm will sue MERS as a co-defendant with the property owner and then turn around and represent MERS as a Vice-President with the drafting and execution of an affidavit and/or mortgage assignment on MERS behalf. In other words, the law firm claims to work for MERS, at the same time they are suing MERS.

**119.**    Often, the same half a dozen names appear on the Mortgage Assignments, which have been filed by the thousands. Upon information and belief, the printed names on the Mortgage Assignments we're not signed by the person whose name appears. Not only were the robo-signers committing forgery and fraud, it would be physically impossible for them to have signed the tens of thousands of documents filed in South Carolina court and county clerks' offices and in the courts and clerks' offices across the nation.

**120.**    In all these cases, the Assignment is prepared to conceal The actual date that the property was to have "passed through" the MBS/Trust to the shareholder/investors. Note Assignments for non-existent Notes and Mortgage Assignment were prepared and filed years after the mortgages and notes were actually fictionally assigned for the benefit of the shareholder/investors prior to the Closing Date of the MBS/Trust. While exact Closing Dates can only be determined by looking at the MBS/Trust

documents, filed with the SEC and IRS, any MBS/Trust that includes the year 2005 in its title closed in 2005.

**121.**   If a Mortgage Assignment is dated, notarized and filed in a year after the year set forth in the name of the grantee trust, it was an Assignment fraudulently made for the sole purpose of facilitating an illegal foreclosure or to use as evidence as standing in an action to challenge a homeowner's TILA Rescission.

**122.**   These Specially-Made Assignments have created havoc in the Courts and were done with the specific purpose of perpetrating a fraud on the Court.

**123.**   In many cases, the foreclosing entities did not even bother to request that the Specially-Made fabricated Assignment be prepared prior to the filing of the foreclosure. In more cases than not, the Assignments are prepared and filed AFTER the foreclosure action has been initiated. The MBS/Trust (who has no beneficial interest in the loan and probably is not in possession of the original Note) files a foreclosure and then attempts to make it appear to the Court that the MBS/Trust magically knew prior to the Assignment that it would acquire the defaulting property several weeks or months after the foreclosure is filed.

**124.**   Courts have repeatedly asked the MBS/Trustee to explain Why they were acquiring non-performing loans and whether such acquisition was a violation of the Trustee's fiduciary duty the beneficiaries

under the MBS/Trust. No MBS/Trustee has ever come forth and explained that MBS/Trust actually listed the loan in its SEC loan list without possessing the loan and that the loan was "acquired" years before the Assignment. As a result, there are many decisions with observations similar to this observation by Judge Arthur M. Schack of Kings County, New York, in **HSBC Bank v. Valentin**, 21 Misc. 3d 1124 [A]: "Further, according to plaintiff's application, the default of defendants Valentin and Ruiz began with the nonpayment of principal and interest due on January 1, 2007. Yet four months later, plaintiff HSCB was willing to take an assignment of the instant nonperforming loan, four months in arrears?"

**125.** In Deutsche Bank National Trust Co. v. Harris, Judge Arthur M. Schack, Kings, New York, Index No. 39192/2007 (05 FEB 2008) opined again: "Further, the Court requires an explanation from an officer of plaintiff DEUTSCHE BANK as to why, in the middle of our national sub-prime mortgage crisis, DEUTSCHE BANK would purchase a non-performing loan from [bankrupt and now dissolved] INDYMAC...."

**126.** In cases where the Trust failed to get a valid Assignment, whether before or after the foreclosure, is further complicated by the actual parties participating as Assignors. Most of the major loan originators, listed on the Mortgages or listed as a "nominee" of MERS on the original Promissory Notes, have been sold, closed or dissolved in bankruptcy. These include, but are not limited to; American Home Mortgage, Option One Mortgage, Countrywide Home Loans, and INDYMAC.

**127.**   Defendants, and other entities such as M&I Bank, Regions Mortgage, Deutsche Bank, U.S. National Bank Association, Bank of America, J.P. Morgan Chase, CITI, MERS, and Servicing Agents such as GMAC, Aurora Loan Services, CitiMortgage, WELLS FARGO BANK N.A. TRUST COMPANY, as TRUSTEE and Nationstar Mortgage, have filed thousands of foreclosure actions in the State of South Carolina and throughout the United States, including against the Plaintiffs, under false pretenses, without the legal authority to bring such suits.

**128.**   Other parties including DOCX, LLC, Lender Processing Services, Inc., in Florida, LSR Processing in Cincinnati, Ohio and the foreclosure mill law firms have facilitated, aided and abetted the Defendants in filing thousands of residential Mortgages and Mortgage Assignments under false pretenses and without legal authority.

## **The Double and Triple Dip and Derivative Contracts**:

**129.**   Many of the MBS/Trusts were covered by an insurance policy, commonly referred to as a Derivative or Collateral Contract. These Derivative Contracts are not recorded or regulated by the SEC. Upon information and belief, the Defendants have attempted to receive distribution, fees or proceeds or have received distributions from the liquidation of the Plaintiffs or the putative homes, when the actual beneficiaries under the homeowners' loans, the shareholder/ investors have been made whole by a Derivative Contract. In other

instances, the MBS has been "closed" months or years prior. Funds collected from the loans allegedly within the MBS, ar no longer being paid to the investors, but are an unearned windfall to the servicer. Additionally, there is no contract between the investors and the foreclosing entity which would allow them so act as a Plaintiff in a Foreclosure even when the MBS is not shut down

130.     Likewise, the MBS/Trusts themselves became parties to Derivative Contracts. Most times, the actual Derivative contract is for more, up to ten times (10x), the face value of the MBS. More often than not, multiple insurance policies were taken and traded on the MBS.

## **Unjust Enrichment**

131.     The Defendants and MERS have illegally filed suit, as Parties and counsel of record, in actions against the Plaintiffs and have received distributions from the sale of their properties, while engaging in one or more of the following illegal practices:

132.     Defendants have filed foreclosures throughout the State Of South Carolina and the United States of America knowing that they were not the "owners" or beneficiaries of the loan they filed foreclosure upon. They knowingly and intentionally set out to deceive the Courts as to this fact and had full knowledge of the fact that they lacked Constitutionally defined "Standing" and capacity to file suit;

133.     The Defendants and MERS have drafted, executed and

filed, or caused to be filed, false and fabricated Promissory Notes, Mortgages, and Assignments of Mortgages, prepared by LPS, by and through DOCX, LSR Processing, employees of foreclosure law firm and employees of the Servicer, in order to foreclose upon properties.

**134.**   These MERS Mortgages and Assignments were prepared By an agreement between the Defendants. These Defendants used false information regarding the individuals executing such Mortgages and Assignments, holding such individuals out to be officers of various banks, mortgage companies and mortgage servicing companies and MERS. At the time the Assignments were executed, the mortgage assignment dated December 2, 2020, Document DBNTC filed March 1, 2021 8:11 am with The Richland Common Pleas Court is a forgery. many of these companies no longer existed and/or had been dissolved in bankruptcy;

**135.**   That upon information and belief, the FDIC as receiver for IndyMac Federal Bank did not assignment of said Mortgage dated December 2, 2020, unto Deutsche Bank National Trust Company as Trustee for residential Asset Securitization Trust 2005-A8CB- mortgage Pass-Through Certificates Series 2005-H **Fraud Upon This Court**

**136.**   Defendants used these MERS Mortgages and Assignments as Exhibits to foreclosures and filed these Assignments in the public record in all one hundred twenty (120) Counties in the State of South Carolina. In all such cases and public recording, essential documentation to

prove chain of title had not been obtained. The essential documentation to prove chain of title does not exist.

**137.**    Defendants filed or caused to be filed MERS Mortgages And Assignments of Mortgages prepared by Defendants with forged signatures of individuals purported to be officers of the entity, such as MERS or bank or mortgage company making the assignment;

**138.**    Defendants repeatedly filed foreclosure and declaratory judgment actions on TILA Rescissions months and sometimes over a year before they acquired any legal interest in the subject property through a fraudulent Assignment of a Mortgage. They have repeatedly claimed and continue to falsely claim that they owned the note executed with the mortgage on the property;

**139.**    Defendants repeatedly filed foreclosures and continue to File foreclosure actions claiming that they have lost the Promissory Note, Mortgage and other necessary documentation or that the documentation is "Unavailable." They falsely lead the Court to believe by inference or actual testimony, that the documentation is missing SUBSEQUENT to the acquisition of the documents, when in fact they have never possessed such documents;

# EXHIBIT-B

## ROGERS TOWNSEND & THOMAS, PC &

## *GETNET™DOCUMENT RECOVERY*

# FIDELITY'S (LPS) SECRET DEALS WITH MORTGAGE COMPANIES AND LAW FIRMS



**140.** **_GETNET™DOCUMENT RECOVERY_**

DOCX's Get Net™ ██████████████████████ is a national network of runners that are engaged to provide ████████████, expedited ██████████, ████████████, and ██████████████

**141.**    The service is unique in that our clients can request that DOCX obtain any missing recordable documents through this web site through our online Get Net™ Work Order Form. Status of existing projects can also be obtained through our Online Services. We also accept work orders the "old fashioned" way via fax or mail. Upon receipt of the work order, DOCX will access the national network of runners, place the order and follow up to ensure prompt delivery.

**142.**    Get Net™ was designed to assist mortgage servicers in meeting agency certifications and to avoid costly penalties for filing late satisfaction pieces.

### 143. Get Net™ Features

**a.** A National Network of title runners retains company in every county jurisdiction nationwide.

**b.** Obtains missing mortgage documents, assignments, title policies and LGC/MICs.

**c.** Expedites recordation by physically walking documents in to county recorder offices.

**d.** Provides title searches to identify mortgage holders. Provides online reporting capabilities.

**e.** Plaintiffs CURTIS   SHEPHERD that FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE for FIDELITY NATIONAL TITLE INSURANCE COMPANY, ROGERS TOWNSEND & THOMAS, PC, is in violation of the Due Process Clause of the U.S. Constitution. but on the Due Process Clause.")

**f.  *GETNET™ RATE SHEET***

| XCODE | SERVICE | AMOUNT |
|---|---|---|
| INF1 | Obtain PIN Number from Online Public Records | $5.50 + SH |
| INF2 | Obtain from Online Public Records Lot Block or Section | $5.50 + SH |
| INF3 | Obtain Property Address | $5.50 + SH |
| INF4 | Obtain Recorded Mortgage, Book, Page or Instrument Number | $12.95 + TPC |
| INF5 | Obtain Vehicle Identification Number | $12.95 + SH |
| CT01 | Cursory Title Search to Identify Mortgagee of Record | $15.95 + TPC |
| TS01 | Perform Complete Title Search | $15.95 + TPC |
| SI01 | Obtain Copy of Mortgage | $12.95 + TPC |
| SI02 | Cure Defective Mortgage | $12.95 + TPC |
| SI03 | Retrieve Certified Copies of Mortgages | $12.95 + TPC |
| PA01 | Obtain Copy of Power of Attorney or Name Certification | $12.95 + TPC |
| PA02 | Record Power of Attorney | $12.95 + TPC |
| PA03 | Obtain Clerk Certified Copy of Power of Attorney | $12.95 + TPC |
| IC01 | Obtain Copy of Installment Contract from VA | $15.95 + SH |
| SA01 | Obtain Copy of Subordination Agreement | $15.95 + TPC |
| MA02 | Obtain Copy of Modification | $15.95 + TPC |
| MI01 | Obtain Copy of MIC | $12.95 + SH |
| MI02 | Correct MIC | $12.95 + SH |
| LG01 | Obtain Copy of LGC | $12.95 + SH |
| LG02 | Correct LGC | $12.95 + SH |

| TP01 | Obtain Copy of Title Policy Within 7 years (based on calender year) | $19.95 + TPC |
|------|------|------|
| TP02 | Correct Existing Title Policy | $19.95 + TPC |
| TP03 | Obtain Copy of Title Policy over 7 years (based on calendar year) | $29.95 + TPC |
| TP04 | Obtain Quotes to Write and Order New Lenders Title Policy | $29.95 + TPC |
| TP05 | Obtain Abstract from Title Company (State of Iowa) | $15.95 + TPC |
| TE02 | Correct Title Policy Endorsement | $15.95 + TPC |
| LN02 | Create Lost Note Affidavit | $12.95 + SH |
| NA01 | Create Note Allonge | $12.95 + SH |
| NC01 | Name Affidavit | $12.95 + SH |
| IA01 | Obtain Copy of Assignment | $15.95 + TPC |
| IA02 | Retrieve Certified Copies of Assignments | $15.95 + TPC |
| IA03 | Create Missing Intervening Assignment | $35.00 + TPC |
| IA04 | Record Prepared Assignments | $12.95 + TPC |
| IA05 | Cure Defective Assignment | $12.95 + TPC |
| IS01 | FHA and VA Mortgage Insurance Submission | $95.00 + TPC |
| UC01 | Retrieving a UCC Package | $15.95 + TPC |
| CF01 | Recreate Entire Collateral File | $95.00 + TPC |
| ER01 | Expedited Recordation: Hand Carry Recordable Documents | $25.00 + TPC |

**144.  Contact DOCX for volume discounts on orders of 200 items or more.**

**145.  TPC = Third Party Costs include Title Runner, County Jurisdictional, courier and postage costs.**

**146.  SH = Shipping costs.**

**147.  The DOCX Service Fee will be invoiced upon receipt**

*of the work order.*

*148.   TPC and SH costs will be billed upon completion of The work order. You can also place orders online at www.docx.com.*

*149.   Getting Started*

*150.   To get started using the DOCX Get Net Service:*

*a. Complete the DOCX Get Net™ Service Agreement and obtain a Client ID. CALL DOCX Marketing at: 888/DOCX-NET 888/362-9638 or email sales@docx.com for an Agreement and Client ID.*

*b. Once you complete the agreement and obtain a Client ID you can submit Get Net™ Work Order Forms. Clients can send work orders via the internet, email, fax, or mail. CALL DOCX Marketing at: 888/DOCX-NET 888/362-9638 or email sales@docx.com for a Work Order form, or how to submit Get Net™ Work Order Forms online.*

*c. Contact DOCX Support at 800/723-0215 Ext 3014 or email support@docx.com for requirements and procedures of email and online Get Net™ Work Order Form.*

## PLAINTIFFS

Plaintiffs (hereinafter "CURTIS   SHEPHERD ") is a resident citizen of The State of Orange Burg County, South Carolina. Are Plaintiffs in Case (a)Fraud Injunction Statute, 18 U.S.C. § 1345, filed in this Court

**151.**   Plaintiffs is requesting that THE INTERVENERS U.S.

Department of Justice ("DOJ") Attorney General Merrick B. Garland Investigate and subpoena for contract compliance between Fidelity/ LPS and HUTCHENS LAW FIRM, LLP the Network Agreement and the Default Services Agreement. And a potential criminal and civil false claims

152.    Plaintiffs is requesting that THE INTERVENERS U.S. Department of Justice ("DOJ") Assistant Attorney General Kristen Clarke Civil Rights Division Investigate and subpoena for in violation of this section18 U.S. Code § 242 – Deprivation of rights under color of law.

153.    Plaintiffs is requesting that THE INTERVENERS U.S. Department of Justice ("DOJ") Richard A. Powers Acting Assistant Attorney General ANTITRUST DIVISION Investigate and subpoena for Defendant's in violation of Section 1 of the Sherman Act (15 U.S.C. ß1)

154.    The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the FDCPA, 15 U.S.C. §§ 1692-1692p, which prohibits abusive, deceptive, and unfair debt collection practices and imposes duties upon debt collectors.

155.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and

the FDCPA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57(b), and 1692l.

## **DEFENDANTS**

## **The Law Firms:**

**156.**　　In or about the last decade, the Defendant Firms joined with Defendant Merscorp, Inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained. The employees of the Defendant Firms, including many licensed attorneys, have become skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to accomplish illegal acts.



**158.   Defendant ROGERS TOWNSEND & THOMAS, PC**

, LLP is a law firm Based principally in the State of South Carolina, This

Defendant (hereinafter "**ROGERS TOWNSEND & THOMAS, PC** ") a RICO

conspirator pursuant to 18 USC §1962 (d), represents to the public that our

primary area of practice is default servicing South Carolina, provides, or

arranges for others to provide mortgage assistance relief services, as

defined in Regulation 0, 12 C.F.R. § 1015.2. which includes foreclosure,

bankruptcy, loss mitigation, litigation, title curative, REO (real estate owned

by lenders), and eviction. This Defendant may be served with process by

serving its Registered Agent and Partner, JOHN J.HEARN Bar #6635),

JASON D. WYMAN Bar Number:#100271), KEVIN T. BROWN, Bar

Number: #64236), CYNHIA THOMAS), at 1221 Main St 14th Fl, Columbia,

SC 29201 At all times material to this complaint, **Defendant "ROGERS**

**TOWNSEND & THOMAS, PC "),** LLP transacts or has transacted business

in the State Of South Carolina.

**159.   Defendant "ROGERS TOWNSEND & THOMAS, PC ")**

with its principal place of business in the state of South Carolina. Herein

after ("D&H",) the firm is one of the regional foreclosure mills, and the

regional corporate counsel for WELLS FARGO BANK N.A. TRUST

COMPANY,

**160.**   Upon information and belief, defendant JOHN J.HEARN

Bar #6635), JASON D. WYMAN Bar Number:#100271), KEVIN T.

BROWN, Bar Number: #64236), CYNHIA THOMAS), shareholders),

a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times

a limited liability partnership organized and existing under the laws of the

State of South Carolina and acted as legal advisor to FIDELITY/LPS or an

instrumentality controlled by him or others.

      **161.**   Defendant Lender Processing Services, Inc. ("LPS")

process[es] the necessary paperwork to pursue non-judicial foreclosure on

behalf of its servicer and lender clients.) a RICO conspirator pursuant to 18

USC §1962 (d), is a Delaware Corporation, with its principal place of

business in Jacksonville, Florida. Although LPS is doing business in the

state of South Carolina, it is not registered to engage in business in the

state of South Carolina. At all times relevant hereto, LPS was the parent

company of DOCX. LPS does business in every bankruptcy court in the

United States of America by agent or employee including this Court. This

company's stock symbol is also LPS.

      **162.**   The defendant LPS Default Solutions is a wholly owned

subsidiary of LPS. a RICO conspirator pursuant to 18 USC §1962 (d), LPS

Default Solutions has its principal place of business at 601 Riverside

Avenue Jacksonville, Florida 32204. LPS Default Solutions provides

management of mortgage loans as a subservice to various national

mortgage servicers when a consumer's loan reaches a predetermined state

of default under the contracts between LPS Default Solutions and its clients

the mortgage servicers as will be more fully set out herein. LPS Default

Solutions may be served by serving process upon Jeffery S. Carbiener, President and CEO, at the address of this Defendant listed above.

**163.**    Defendant Fidelity National Foreclosure Solutions, Inc. (f/k/a Fidelity National Foreclosure & Bankruptcy Solutions), a RICO conspirator pursuant to 18 USC §1962 (d), is a Delaware corporation with its principal place of business at 1270 Northland Drive, Suite 200, Mendota Heights, Minnesota 55120. Fidelity National Foreclosure Solutions, Inc. can be served through its registered agent for service of process, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801

**164.**    Upon information and belief, defendant WELLS FARGO BANK N.A. TRUST COMPANY,   as Trustee (" █████████████████ █████████████████ ), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a foreign bank Is Not authorized to do business in the State of South Carolina

**165.**    Defendant Mortgage Electronic Registration Systems, Inc. ("MERS"), a RICO conspirator pursuant to 18 USC §1962 (d), was at all relevant times a Delaware corporation Is Not authorized to do business in the State of South Carolina

**166.**    John Does "1" through "10" are intended to designate additional co-conspirators and members of the RICO Enterprise involved in Money Laundering, Bankruptcy Fraud, and/or Bid Rigging as

more fully described herein.

167.    The foregoing defendants constitute a RICO Enterprise because they satisfy the definition of 18 USC §1964 (1) in that they are: any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. The defendants also constitute a RICO association-in-fact Enterprise by evidence of their ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit.

## THE FRAUD INJUNCTION ACT

168.    Title 18, United States Code, Section 1345 provides that if A person is "Violating or about to violate" statutes prohibiting mail and wire fraud, among others, "the Attorney General may commence a civil action in any Federal court to enjoin such violation." It continues by stating that the Court "shall proceed as soon as practicable to the hearing and determination of such an action, and may … enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." Congress intended Section 1345 to put a "speedy end" to "fraudulent acts or practices." S. Rep. No. 98-225, at 401-02 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3539-40. See also Stop the Bleeding: Using Civil Injunctions under 18 U.S.C. § 1345 to Stop Fraud, DOJ Journal of Federal

Law and Practice, December 2018, p. 29

**169.**    As Plaintiff has pled a case for fraud in the inducement

With particularity. Plaintiff's complaint sets forth allegations detailing the

"Originate to distribute" model of real estate lending that establishes the

basis for a fraud in the inducement claim. Before MERS, it would not have

been possible for mortgages with no market value (due to a predictably

high likelihood of default), to be sold at a profit or sold as mortgage-backed

securities. Before MERS, it would not have been possible for Defendants to

conceal predatory origination of residential loans and the fraudulent resale

of otherwise non-marketable loans. Before MERS, the actual beneficiary of

every deed of trust on every parcel in the United States and the State of

South Carolina could be easily ascertained by merely reviewing the public

Records at the local recorder's office where documents reflecting any

ownership interest in real property are kept.

**170.**    After MERS, it was impossible for a borrower, his or her

attorneys, the courts, the government or anyone else to identify the actual

beneficial owner of any particular loan of the property which was the

collateral securing the loan. After MERS, from the moment the deed of trust

was executed by the borrower, there was no "beneficiary" under the deed

of trust, and all subsequent assignments of any interest in the loan and

deed of trust was known by the Defendants to be fraudulent and unlawful.

After MERS, the servicing rights to predatory loans, such as Plaintiff's,

were retained by the originator or transferred to other predatory entities for

the specific purpose and with the specific intent to ultimately foreclose on the residence and take the borrower's home.

171.   In the case of Plaintiff and others similarly situated, the servicing rights were transferred after the origination of the loan to an entity so large that communication with the servicer became difficult if not impossible. The servicer in many instances did not know the identity of the actual beneficiary or owner of the note because the note had been bundled with others and sold as mortgage-backed securities. Therefore, the services did not have the authority to negotiate a loan modification of the loan or to respond appropriately to evidence presented to the servicer by the borrower of predatory lending in the origination of the loan. The servicer was interested in one thing – making a profit from the foreclosure of the borrower's residence – so that the entire predatory cycle of fraudulent origination, resale and securitization could occur again. This is the legacy of MERS, and the entire scheme was predicated upon the fraudulent designation of MERS as the "beneficiary" under millions of deeds of trust in South Carolina and other states.

## BACKGROUND ON DEFENDANTS' SCHEME

172.   The operation of the FIDELITY/LPS, , ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE for FIDELITY NATIONAL TITLE INSURANCE COMPANY, ROGERS TOWNSEND & THOMAS, PC, and their Controlled Company has 14 of the 15 biggest loan servicers as clients and

all of the nation's 50 largest banks use at least some of its services. Controlled Servicer an organization agrees to maintain in full force and effect. A professional Liability Policy. The minimum amount of Coverage shall not be less than one Million Dollars ($1,000.000.000). that collect a bogus fee, debt, and payment to assist in managing the foreclosure process of a fraudulent lender, **SEE: WELLS FARGO BANK, N.A. v MARCHIONE, a**ll communications went through LPS' Desktop system – the Company's work-flow processing web-based software application settlement services and default solutions, Enterprise is substantially controlled by Defendant FIDELITY/LPS, a non-attorney Firm (—Defendants) are engaged in an ongoing foreclosure-rescue scheme to defraud distressed homeowners nationwide through the operation of FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). claims to be a company Committed to helping homeowners remain in their homes and secure them for long time use. See Lender Processing Services, Overview, http://phx.corporate-ir.net/phoenix.zhtml and https://hutchenslawfirm.com (Viewed on July 12, 2021). As set forth more fully in the Complaint and below, loan modification, rather than helping homeowners remain in their homes as promised, FIDELITY/LPS,  ROGERS TOWNSEND & THOMAS, PC,). instead preys upon Distressed homeowners and dupes them into paying thousands of dollars to FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). in reliance upon false promises and false representations, while FIDELITY/LPS, , ROGERS TOWNSEND & THOMAS, PC,) provides

no meaningful assistance to prevent foreclosure or to allow homeowners to remain in their homes. In the past twenty-one months, FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). has fraudulently taken approximately $ 200,000, from CURTIS  SHEPHERD, by each of the Defendants for Concealment of Default Insurance Payment that was paid out from the Plaintiffs Property and using Plaintiffs Names to secure Insurance Payments from a Fraudulent Insurance Kickback-scheme. And $3,000,000 from over 450 homeowners across the nation, and fraudulently taken title to their homes. FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). is rapidly expanding its fraud: It has defrauded CURTIS SHEPHERD Homeowners from more than $1,000,000 in the last two months of 2021 alone. The State of Richland County, South Carolina. Are Plaintiffs in Case No.2021-CP-4000895 RCP, filed in this Court 18 U.S. Code § 1345 – Injunctions against fraud, FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). Defendants seek foreclosure by collecting a bogus fees, debt, and payment To assist in managing the foreclosure process of a fraudulent lender, **example ROGERS TOWNSEND & THOMAS, PC,).** agrees to maintain in full force and effect. A professional Liability Policy. The minimum amount of Coverage shall not be less than one Million Dollars ($1,000.000.000) Default Invoice settlement services for payment concealment of ($200,900.00), Kickback to ROGERS TOWNSEND & THOMAS, PC,). South Carolina Law Prohibits the kickback fee agreement between FIDELITY/LPS, ROGERS

TOWNSEND & THOMAS, PC,) During the Fraudulent foreclosure Period, **See** LPS' Form 10-K for the period ending December 31, 2009, filed on February 23, 2010, Defendants also Repeatedly acknowledged the problematic business practices at DocX and their internal investigation of this entity. For example, Defendants made the following admissions:

- see: *Schneider, Kenneth, et al. vs. Lender Processing Services, Inc., et al.*
- see: **Clark v LPS LItigation 2012-07-23.Class Action**
- see: **U.S. Trustee Sanction, Fidelity/LPS, Ron Wilson  CASE NO. 07-11862 And the Boles Law Firm for making misrepresentations:**
- see: **FDIC v. LSI, LPS, Fidelity, et al.**
- see: **United States of America v Lorraine Brown Case No. 3:12 –CR-198-j-25-MCR.**

- **See:** "Foreclosure Mill" Florida Bar v. David j. Stern-Complaint, Consent judgement, Report of Referee, and Judgment

- **See:** "Foreclosure Mill "Order to Show Cause Why Ben Ezra & Katz

- **See:** "Foreclosure Mill" Ben-Ezra & Katz, Sanction for Fraud, Is Having a Very Bad

- **See:** "Foreclosure Mill" Fraud on The Court Fishman & Shapiro, **See:** Wamu, Chase, JP MORGAN V. POCOPANNI DUVAL, COUNTY FLORIDA CASE NO.: 16-2008-CA-3989.

- **See:** THE FLORIDA BAR v FORECLOSURE MILL MARSHALL C WATSON CONDITIONAL GUILTY PLEA FOR CONSENT JUDGEMENT

  **See**: American Home Mortgage Servicing Inc. v Lender Processing Services

**See:** "DEPOSITION TRANSCRIPT OF DEUTSCHE BANK NATIONAL
TRUST CO. VP RONALDO REYES Be prepared to blown away
with April Charney and Linda.

**See:** FULL DEPOSITION TRANSCRIPT OF LENDER PROCESSING
SERVICES SCOTT A. WALTER PART 2 "STEVEN J. BAUM, P.C.",
"O. MAX GARDNER", "US TRUSTEE"

**See:** FULL DEPOSITION TRANSCRIPT OF CHRISTIAN S. HYMER 1ST VP
OF OPERATIONS FOR LENDER PROCESSING SERVICES (LPS)
MINNESOTA

**See:** DEUTSCHE BANK NATIONAL TRUST Ronaldo Reyes DEPOSITION
RANSCRIPT OF DEUTSCHE BANK NATIONAL TRUST VP RONALDO
REYES

**See:** PT. 2 "NO TRUST LOAN TRANSFER" DEPOSITION TRANSCRIPT OF
DEUTSCHE BANK NATIONAL TRUST CO. VP RONALDO REYES

**173.**   FIDELITY/LPS, ROGERS TOWNSEND & THOMAS,

PC,) FIDELITY/LPS, was created at the direction of JOHN J.HEARN Bar

#6635), JASON D. WYMAN Bar Number:#100271), KEVIN T. BROWN,

Bar Number: #64236), CYNHIA THOMAS), shareholders for the

sole purpose of perpetrating this fraudulent scheme.  FIDELITY/LPS,

ROGERS TOWNSEND & THOMAS, PC,) has a criminal history of fraud,

including mail fraud, wire fraud, money laundering, mortgage fraud, and

racketeering convictions in federal and state courts. **See** cases above,

FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,) entire operation

is predicated on fraud and serves no legitimate purpose except to enrich

the individual Defendants at the expense of distressed homeowners.

**174.**   The United States invokes the Fraud Injunction Statute,

18 U.S.C. § 1345, to request a temporary restraining order and preliminary

injunction to stop Defendants 'ongoing fraud and to freeze assets. By engaging in the fraudulent scheme, Defendants are violating the mail and wire fraud statutes. The Fraud Injunction Statute authorizes the United States to commence a civil action in any federal court to enjoin persons who are violating, or about to violate, the substantive provisions of, among others, the mail fraud statute and the wire fraud statute. See 18 U.S.C. § 1345(a). Where, as here, an injunction is sought, section 1345 provides that a district court —may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought, and —prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any of the fraud-tainted proceeds, or property of equivalent value. 18 U.S.C. §§ 1345(b), (a)(2). The United States meets its burden under section 1345 because Defendants are engaged, or about to engage, in mail fraud, wire fraud, or violations of other enumerated predicate acts.

**175.**   The State of South Carolina invokes for injunctive relief the federal Mortgage Assistance Relief Services Rule (MARS Rule), 16 C.F.R. Part 322, which became effective on December 29, 2010, except the ban on advance fees, effective January 31, 2011. The MARS Rule —[p]rohibits providers of such mortgage assistance relief services from making false or misleading claims . . . bar[s] the collection of advance fees

for these services . . . [and] prohibit[s] anyone from providing

**176.**    substantial assistance or support to another they know or consciously avoid knowing is engaged in a violation of the Rule . . . .75 Fed. Reg. 75,092, at 75,092 (Dec. 1, 2010) (Summary).

**177.**    The attorney general for South Carolina may enforce the MARS Rule and obtain injunctive relief under Section 626(b) of the 2009 Omnibus Appropriations Act. 16 C.F.R. § 322.10. Under Section 626(b) a state attorney general who —has reason to believe that an interest of the residents of the State have been or is threatened or adversely affected by the engagement of any person . . . in practices that violatell the MARS Rule, may bring a civil action to enjoin that practice.

**178.**    The United States and the State of South Carolina bring this  action to protect the public, and to secure the proceeds of the fraud for eventual return to the victims. Absent the requested injunctive relief, the public will continue to be victimized by Defendants, and ill-gotten gains will be dissipated and become unrecoverable. The requested relief is calibrated to protect Defendants 'past and would-be victims, and includes the freezing of bank accounts controlled by Defendants and into which fraud-tainted money has been deposited.

**179.**    In particular, Plaintiffs immediately seek a temporary restraining order ex parte, based on the pleadings and declarations presented to the Court, because Defendants 'fraud should be immediately

halted and because premature notice to Defendants would provide an

opportunity for Defendants to dissipate, transfer or conceal their ill-gotten

gains, and thereby undermine the ability of the Court to protect the public to

the extent now possible. Other courts have granted similar ex parte

temporary restraining orders to stop ongoing fraud. See, e.g., United States

v. DBB, Inc., 180 F.3d 1277 (11th Cir. 1999) (court granted ex parte TRO to

prevent dissipation of assets); United States v. Petters, 2011 U.S. Dist.

Lexis 13357 (D. Minn., Jan. 25, 2011) (court granted ex parte TRO freezing

all assets belonging to defendants accused of committing mail, wire, and

banking fraud in order to preserve assets for restitution and forfeiture). The

need for ex parte relief is particularly keen here, where the individual

directing the scheme has a history of violating the law for his own financial

gain.

## **LEGAL ARGUMENT**

**180.**   Plaintiff CURTIS   SHEPHERD is entitled to relief under

The Fraud Injunction Statute. The supporting declarations establish

probable cause to believe that Defendants are engaged in an ongoing

scheme to commit mail fraud and wire fraud. This showing is sufficient to

support the requested relief, intended to stop the ongoing fraud and protect

the public The State of South Carolina is equally entitled to relief under the

FTC 's MARS Rule, 16 C.F.R. Part 322, which grants the state attorneys

general authority to enforce the MARS Rule and obtain injunctive relief. 16

C.F.R. § 322.10 and Section 626(b) of the 2009 Omnibus Appropriations

Act. The supporting declarations likewise establish that Defendants 'Conduct violates several provisions of the MARS Rule, including the prohibition against mortgage assistance relief providers making false or misleading claims, collecting advance fees, and providing substantial assistance or support to another they know or consciously avoid knowing is engaged in a violation of the MARS Rule.

## I. Injunctive Relief Is Warranted Under the Fraud Injunction Statute

**181.** Under the Fraud Injunction Statute, the Court should enjoin the fraud and also enjoin alienation of fraud-tainted assets

## A. The Fraud Injunction Statute permits courts to immediately enjoin ongoing fraud and restrain assets

**182.** Congress enacted 18 U.S.C. § 1345 as part of the Comprehensive Crime Control Act of 1984. See Pub. L. No. 98-473, § 1205(a), 98 Stat. 1837, 2152 (1984). It explained that it was providing the Attorney General with a tool to protect innocent victims from ongoing fraudulent schemes and to protect the illegally obtained proceeds of those schemes from dissipation. The legislative history to section 1345 explains that it will —allow the Attorney General to put a speedy end to a fraud scheme by seeking an injunction in federal district court whenever he determines he has sufficient evidence of a violation of chapter 63 to initiate such an action. The court is to grant such action as is warranted to prevent a continuing and substantial injury to the class of persons designed to be protected by the criminal statute allegedly being violated. ‖ See S. Rep.

225, 98th Cong., 2d Sess. 401-02, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3539-40. Section 1345 does not create a substantive offense. Rather, it provides a civil injunction remedy —in any Federal court‖ to enjoin violations of enumerated statutes, including the mail and wire fraud statutes. Specifically, section 1345 provides, in relevant part:

(a)(1) If a person is —



and may, at any time before a final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

**18 U.S.C. § 1345(b) (emphasis added).**

**B. For injunctive relief under section 1345, it is sufficient to show probable cause of a statutory violation.**

**183.**  As noted above, section 1345 is a civil statute, and the legislative history to section 1345 explains that the Attorney General may seek an injunction —whenever he determines he has sufficient evidence of a violation of chapter 63 to initiate such an action. ‖ See S. Rep. 225, 98th

Cong., 2d Sess. 401-02, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3539-40. In determining what is sufficient evidence in an action under section 1345, courts have generally considered whether there is evidence of a continuing violation, and have not required any elevated factual showing. A majority of courts have found that an injunction is warranted if the United States establishes —probable causell to believe that the defendants are engaged in a violation of one or more of the predicate statutes. See United States v. Smith, 502 F. Supp. 2d 852 (D. Minn. 2007) (probable cause standard); United States v. Payment Processing Ctr., LLC., 461 F. Supp. 2d 319, 323 (E.D. Pa. 2006) (same); United States v. Lidahl, 356 F. Supp. 2d 1289 (S.D. Fla. 2005) (same); United States v. William Savran & Associates, 755 F. Supp. 1165 (E.D.N.Y. 1991) (same); United States v. Belden, 714 F. Supp. 42, 45-46 (N.D.N.Y. 1987) (same); United States v. Gupta, 2011 U.S.Dist. LEXIS 97264 (C.D. Ill. Aug. 30, 2011) (same); United States v. Jamie, 2011 U.S. Dist. LEXIS 4678 (S.D. W. Va., Jan. 18, 2011) (same); United States v. Hobbs, 2008 U.S. Dist. LEXIS 88200 (S.D. Ill. Oct. 31, 2008) (same).Courts have reasoned that the probable cause standard is appropriate because probable cause is the standard applicable under the postal detention of mail statute, 39 U.S.C. § 3007, which is the remedy that Congress sought to enhance when it enacted 18 U.S.C. § 1345. Belden, 714 F. Supp. at 44-45. **See also United States v. Beamish**, 466 F.2d 804 (3d Cir. 1972) (Probable cause standard applies to injunctions sought under § 3007). It

would be incongruous to impose a higher standard under § 1345, when Congress wanted to provide a better weapon to protect victims of fraudulent schemes during the often-lengthy time required to investigate and prosecute the underlying charges. See Belden, 714 F. Supp. at 45 (—it is unlikely that Congress intended to hold the government to a more stringent standard than that of probable cause when relief under § 1345 was sought, since § 1345 was intended to make it easier for the government to obtain preliminary injunctions as a means of terminating fraudulent schemes during the pendency of criminal investigations than had been possible under 39 U.S.C. § 3007").

**184.**   Other courts have required that the government establish a likelihood of success on the merits by a preponderance of the evidence. United States v. Sriram, 147 F. Supp. 2d. 914, 938 (E.D. Ill. 2001); see also United States v. Brown, 988 F.2d 658, 660 (6th Cir. 1993) (imposing traditional standards of civil litigation); United States v. Hoffman, 560 F. Supp. 2d 772, 777 (D. Minn. 2008); United States v. Williams, 476 F. Supp. 2d 1368, 1374 (M.D. Fla. 2007); United States v. Barnes, 912 F. Supp. 1187 (N.D. Iowa 1996); United States v. Quadro Corp., 916 F. Supp. 613 (E.D. Tex. 1996).

**185.**   This distinction – between —probable causell of a violation, or a likelihood of success on the merits by a preponderance of the evidence -- "may be more apparent than real." See United States v. Fang, 937 F. Supp. 1186, 1196-97 (D. Md. 1996). As the court in Fang pointed

out, the traditional standard for injunctive relief is "reasonable probability" of success on the merits. Id. Reasonable probability of ultimate success must mean something less than actual proof by a preponderance of the evidence inasmuch as evidence sufficient to support an injunction may be less than that needed to obtain a verdict at trial. Id. at 1197. Moreover, the definition of "reasonable probability" is substantially the same as the definition of probable cause. Id. Thus, there may not be any substantive difference between the traditional standard for issuance of an injunction and the probable cause standard embraced by many courts.

## C. Irreparable harm need not be shown.

**186.**    In order to obtain injunctive relief here under 18 U.S.C. § 1345(a), the United States need only show that Defendants are engaged in an ongoing violation of the mail or wire fraud statutes. A showing of irreparable harm is not a necessary element for a § 1345 injunction. Courts have declined to require a showing of irreparable harm in actions under section 1345, reasoning that such harm is presumed under the statute. For example, in William Savran, the court explained that a showing of irreparable harm is not necessary where Congress has, by specific statutory provision, authorized injunctive relief:

> In other areas where Congress has provided for Governmental enforcement of a statute by way of an injunction, the courts have consistently held that irreparable harm need not be demonstrated, and that so long as the statutory conditions are met,

**irreparable harm to the publicis presumed.** William Savran, 755 F.

Supp. at 1179 (citations omitted) (emphasis added). See also Government

of the Virgin Islands v. Virgin Islands Paving, Inc., 714 F.2d 283, 286 (3d

Cir. 1983) (no need to show irreparable harm where statute intended to

protect the public). Likewise, in United States v. Sriram, the court found that

to obtain an injunction under 18 U.S.C. § 1345, the government did not

need to establish irreparable injury. 147 F. Supp. 2d at 937-38. More

generally, courts have found that under section 1345, it is enough to show

an ongoing violation, and that Congress did not separately require the

United States to meet the other elements for injunctive relief. Sriram, 147 F.

Supp. 2d at 937-38. Similarly, in United States v. Fang, 937 F. Supp. at

1199-1200, the court held that, in the context of the Fraud Injunction

Statute, there is no need to establish irreparable harm, inadequacy of the

remedy at law, public interest or balance of hardships, as all of these

elements are presumed once the government has made its showing on

the merits. Id.9

9 See also United States v. Williams, 476 F. Supp. 2d 1368, 1377 (M.D.
Fla. 2007) (—Once illegal activity is clearly demonstrated by a plaintiff
under 18. U.S.C. Section 1345, the remaining equitable factors of
continuing irreparable injury, the balance of hardships to the parties, and
the public interest are presumed to weigh in favor of granting injunctive
relief.‖); United States v. Livdahl, 356 F. Supp. 2d 1289, 1290-91 (S.D. Fla.
2005) (—The Court concludes that because [section 1345] expressly
authorize[s] injunctive relief, no specific finding of irreparable harm is
necessary, no showing of inadequacy of other remedies at law is
necessary, and no balancing of the interests of the parties is required prior

to the issuance of a preliminary injunction in this case.ll); United States v. Quadro Corp., 928 F. Supp. 688, 697 (E.D. Tex. 1996) (under section 1345 the government need not establish actual injury or irreparable harm because it is presumed); United States v. Barnes, 912 F. Supp. 1187, 1195 (N.D. Iowa 1996) (same); United States v. Weingold, 844 F. Supp. 1560, 1573 (D.N.J. 1994) (proof of irreparable harm is not necessary). But see United States v. Hoffman, 560 F. Supp. 2d 772, 776 (D. Minn. 2008) (applying traditional factors,

**187.** The Tenth Circuit has not squarely addressed this issue in the context of a section 1345 injunction, but it has recognized the general principle that where an injunction is authorized by statute (as it is here), enforcement of the statute does not require a showing of irreparable harm. Mical Commun., Inc. v. Sprint Telemedia, Inc., 1 F.3d 1031, 1035-36 (10th Cir. 1993) (—When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.") (Quoting Atchison, Topeka and Santa Fe Railway Co. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981)). Violation of such statutes is presumed to cause public harm; the government need only establish that defendants have violated the statute and there exists "some cognizable danger of recurrent violation." Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230-31 (10th Cir. 1997) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).

**D. The evidence shows that Defendants are engaged in an ongoing mail and wire fraud scheme**.

**188.**    The Plaintiffs and United States has provided the Court with declarations and sworn testimony establishing that Defendants have engaged in violations of the mail and wire fraud statutes, and that such offenses are ongoing

a.    The mail and fraud statutes are violated when there is either a scheme to defraud or false representations and promises

The mail and wire fraud statutes criminalize (1) any scheme or artifice to obtain money "by means of false or fraudulent pretenses, representations, or promises," or (2) any "scheme or artifice to defraud," where such a scheme involves the use of the mails or interstate wires. 18 U.S.C. §§ but noting that where the United States seeks an injunction under section 1345 —the threat of substantial injury to a class of persons for whose protection the government initiates may substitute for the irreparable harm injury‖).1341, 1343.

**189.**    "Although largely overlapping, a scheme to defraud, and a scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, are separate offenses." United States v. Cronic, 900 F.2d 1511, 1513 (10th Cir. 1990) (emphasis added). See also United States v. Bonnett, 877 F.2d 1450, 1454 (10th Cir. 1989) ("The mail and wire fraud statutes make the same distinction as § 1344 between schemes to defraud and schemes to obtain property by false or fraudulent pretenses, representations, and promises.").

**190.**   A scheme to obtain money by false or fraudulent pretenses can be shown by evidence of statements that were false or fraudulent. "A scheme to obtain money by means of false or fraudulent pretenses, representations, or promises, … focuses on the means by which money was obtained. False or fraudulent pretenses, representations or promises are an essential element of the crime." Cronic, 900 F.2d at 1513-14.Showing a —scheme to defraud, ‖ on the other hand, requires conduct designed to deceive, but does not require showing false statements. "The offense of a scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to affect the result. Schemes to defraud, therefore, may come within the scope of the statute even absent an affirmative misrepresentation." Cronic, 900 F. 2d at 1513. "A scheme or artifice to defraud connotes a plan or pattern of conduct which is intended to deceive persons of ordinary prudence and comprehension." United States v. Hanson, 41 F.3d 580, 583 (10th Cir. 1994) (internal quotations omitted). "A schemer's indifference to the truth of her statements may constitute fraudulent intent, 'and even though a defendant may firmly believe in [her] plan, [her] belief will not justify baseless or reckless representations.'" Id. (quoting United States v. Reddeck, 22 F.3d 1504, 1507 (10th Cir. 1994)). Here, the Plaintiff CURTIS   SHEPHERD and United States has established that Defendants are engaged in a scheme to obtain money by means of false representations or promises a scheme to defraud.

a. Defendants are engaged in a scheme to obtain money by false representations or promises.

**191.** The United States has established that Defendants make false representations and promises in order to obtain money from distressed homeowners. Specifically, Defendants make, or cause to be made, false representations and promises that the homeowner will avoid foreclosure, that FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). will purchase or otherwise settle with Default mortgage Insurance, that federal law guarantees the homeowner the right to remain in the home for the duration of the lease with FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). regardless of any foreclosure sale, and that the homeowner will have an option to repurchase the home from FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). Homes for significantly less than the amount currently owed on the mortgage:

**The homeowner will avoid foreclosure**

**192.** FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,).The —Why solicitation promises homeowners that they will have —No foreclosure on credit report. Until recently, the video introduction on the FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). website also promised that under the FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,). —You 'll avoid foreclosure. Thus, at the time that many homeowners don't even know that Once FIDELITY/LPS, ROGERS

TOWNSEND & THOMAS, PC,).WFM filed from 2011 to 2019 8:11 am with

The Orange Burg Common Pleas Court charge homeowners a

Court fees for services, is a violation of the Due Process Clause of the U.S.

Constitution. United States FIDELITY/LPS, ROGERS TOWNSEND &

THOMAS, PC,), the website also promised that the homeowner would

avoid foreclosure by way of loan modification rescue scam.

**193.**    But, as evidenced in the attached declarations, this is a

false, illusory promise, because FIDELITY/LPS, ROGERS TOWNSEND &

THOMAS, PC,) is not successful in permanently stopping the foreclosure

Action. Under the program, because neither the homeowner nor

FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC,) is paying the

mortgage, and because FIDELITY/LPS, ROGERS TOWNSEND &

THOMAS, PC,), does not purchase the mortgage, the foreclosure sale is

inevitable. And because the homeowner remains the mortgagor, the

foreclosure will ultimately be reported on the homeowner 's credit report.

**194.**    FIDELITY/LPS, ROGERS TOWNSEND & THOMAS,

PC,) will settle with the Default mortgage Insurance, In Return for the

Plaintiffs Property

**E. An injunction is warranted to stop the ongoing fraud and freeze
Defendants' assets to prevent ongoing harm to homeowners.**

**1. Section 1345 authorizes broad relief.**

**195.**    The Fraud Injunction Statute provides broad authority for

a court to —enter such a restraining order or prohibition, or take such other

action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. ‖ 18 U.S.C. § 1345(c).

196.    In addition, the statute specifically authorizes special remedies -- including the restraint of substitute property -- for certain types of violations. It provides that —[i]f a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title) … or property which is traceable to such violation, the Attorney General may commence a civil action in Federal court … for a restraining order to prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value. ‖ 18 U.S.C. § 1345(2)(B)(i) (emphasis added). A —banking law violation‖ is defined in section 3322(d) as a —violation of or conspiracy to violate: certain enumerated offenses, including —section 1341 [mail fraud] or 1343 [wire fraud] affecting a financial institution. ‖ 18 U.S.C. § 3322(d)(1)(B). The term —financial institution, ‖ in turn, is defined in 18 U.S.C. § 20 to include a —mortgage lending business. ‖ 10 Here, Defendants 'ongoing mail and wire fraud affects financial institutions--namely, the mortgage lenders that originated, service, or otherwise hold the mortgages of the homeowners who enter into the FIDELITY/LPS, , ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE for FIDELITY NATIONAL TITLE INSURANCE COMPANY, . Defendants,

through their fraudulent scheme, induce homeowners to pay —rent‖ to

FIDELITY/LPS, , ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO

BANK N.A. TRUST COMPANY, AS TRUSTEE for FIDELITY NATIONAL

TITLE INSURANCE COMPANY, in lieu of making their mortgage payment.

Because the inevitable result of Defendants 'scheme is foreclosure, the

mortgage lender is affected. As such, because the Defendants 'ongoing

mail and wire fraud is an offense —affecting a financial institution, ‖

Defendants are engaged in a —banking law violation‖ under the Fraud

Injunction Statute.

## 2. An injunction is needed to enjoin the ongoing fraud and prevent serious harm to victims.

  **197.**  An order enjoining the ongoing fraud is warranted.

Defendants 'fraudulent conduct is not only continuing unabated, but is

rapidly expanding. In the past twenty-one months, FIDELITY/LPS, ,

ROGERS TOWNSEND & THOMAS, PC ). has fraudulently taken

Approximately $ 200,019.00, from CURTIS SHEPHERD by each of the

Defendants For Concealment of Default Insurance Payment that was paid

out from the Plaintiffs Property and using Plaintiffs Names to secure

Insurance Payments from a Fraudulent Insurance Kickback-scheme. And

$3,000,000 from over 450 homeowners across the nation, and fraudulently

taken title to their homes. FIDELITY/LPS, ROGERS TOWNSEND &

THOMAS, PC ). is rapidly expanding its fraud: It has defrauded CURTIS

SHEPHERD Homeowners from more than $1,000,000 in the last two

months of 2021 homeowners victimized by the fraudulent scheme. Despite

being on notice of the United States 'and the State In the past twenty-one

months, nation, and fraudulently taken title to their homes. FIDELITY/LPS,

ROGERS TOWNSEND & THOMAS, PC ). is rapidly expanding its fraud: It

has defrauded CURTIS   SHEPHERD Homeowners from more than

$1,000,000 in the last two months of 2021

10 —[T]he term _mortgage lending business 'means an organization which
finances or refinances any debt secured by an interest in real estate,
including private mortgage companies and any subsidiaries of such
organizations, and whose activities affect interstate or foreign commerce. ‖
18 U.S.C. § 27. of South Carolina investigation into their conduct,
Defendants have expanded their scheme, obtaining over $1,000,000 in the
last two months of 2021 alone.

**198.**    Defendants continue to solicit distressed homeowners

and have expanded their network of representatives to market the scheme.

Absent injunctive relief, the victimized homeowners will continue to pay

—rent‖ to FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC ).) and

more distressed homeowners will be solicited and snared into the scheme.

These homeowners will not only lose thousands of dollars, they will also

lose the opportunity to work with their lender or a legitimate mortgage

assistance provider to avoid foreclosure. As such, this Court should use its

discretion under the Fraud Injunction Statute to —enter such a restraining

order or prohibition, or take such other action, as is warranted to prevent a

continuing injury to … any class of person or class of persons for whose protection the action is brought. ‖ 18 U.S.C. § 1345(b).

**3. An injunction temporarily freezing Defendants 'assets is needed to prevent dissipation and to ensure that victims can recover.**

  **199.** An injunction is also warranted to provide relief to victims. As set forth above, because Defendants have ill-gotten gains as a result of a banking law violation, the Fraud Injunction Statute provides this Court with the discretion to freeze Defendants 'assets to prevent the alienation or dissipation of the fraud proceeds. 18 U.S.C. § 1345(a)(2). In fact, courts have routinely used their discretion under § 1345(b) to freeze assets related to a mail or wire fraud. See United States v. Brown, 988 F.2d 658 (6th Cir. 1993) (finding that Congress intended that district courts have the authority to freeze assets that are the fruit of the fraud); United States v. Quadro Corp., 916 F. Supp. 613 (E.D. Tex. 1996) (same); United States v. Barnes, 912 F. Supp. 1187 (N.D. Iowa 1996) (freezing of assets was within proper scope of preliminary injunction against mail fraud). Here, the court should order the requested relief, freezing Defendants 'assets, because those assets are at risk of being dissipated or concealed.

  **200.** Each month, most of the money paid to FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC ). by virtue of the fraudulent scheme is quickly dissipated for Defendants 'personal expenses. To be sure, it is not used to purchase mortgages, which is FIDELITY/LPS, ROGERS TOWNSEND & THOMAS, PC ). 'Purported mission. Large sums

of money are also routinely withdrawn as cash from the FIDELITY/LPS,

ROGERS TOWNSEND & THOMAS, PC ). 'Account and otherwise

transferred into accounts controlled by Attorneys JOHN J.HEARN Bar

#6635), JASON D. WYMAN Bar Number:#100271), KEVIN T. BROWN,

Bar Number: #64236), CYNHIA THOMAS)(JASON T. MOSS, shareholders

of FIS and others. Absent an order freezing Defendants accounts, the

Defendants will continue to dissipate, alienate, and conceal the proceeds of

the fraud, thus depriving the victims of Defendants 'scheme any chance of

meaningful restitution.

**201.**   The Court also should freeze the assets of the Relief

█████████JASON T. MOSS███ the amount of the fraud-tainted proceeds

that she has received. Federal courts regularly permit the government to

sue nominal defendants in order to recover fraud proceeds. "[A]mple

authority supports the proposition that the broad equitable powers of the

federal courts can be employed to recover ill-gotten gains for the benefit of

the victims of wrongdoing, whether held by the original wrongdoer or by

one who has received the proceeds after the wrong." SEC v. Colello, 139

F.3d 674, 676 (9th Cir. 1998). A "nominal defendant" is a person who: "(1)

has received ill-gotten funds; and (2) does not have a legitimate claim to

those funds." SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998).

Here, the Relief Defendant, JASON T. MOSS, is an employee of

FIDELITY/LPS, MOSS & ASSOCIATION, ROGERS TOWNSEND &

THOMAS, PC ), the director of Quality control) and the Co counselor of

Defendant Clients like PHH Mortgage Services, IndyMac Mortgage service, Ocwen Loan Servicing, LLC, Deutsche National Trust Company, Bank of America, One West Bank, FSB, WELLS FARGO BANK N.A. TRUST COMPANY, that is part of the Defendants Mortgage, go to LPS' Desktop system is a web-based, "Middleware enterprise workflow FIDELITY/LPS, MOSS & ASSOCIATION, ROGERS TOWNSEND & THOMAS, PC, Blanket contractual liability insurance is **liability insurance that provides coverage for all contracts in which the insured is assuming liability**. Blanket contractual liability insurance is most commonly used in situations in which a business is working with a third party, especially if that third party is using the business' property. Mr. SHEPHERD has suffered damage by ("M") "Mortgage Insurance" Means Insurance protecting Lender against Nonpayment of. Or default. On the loan.  Plaintiff  CURTIS SHEPHERD has suffered damage by FIDELITY NATIONAL TITLE INSURANCE COMPANY, FIDELITY/LPS, MOSS & ASSOCIATION, ROGERS TOWNSEND & THOMAS, PC, knowingly Concealed that IndyMac Mortgage, FSB the Servicer agrees to maintain in full force and effect. A professional Liability Policy. The minimum amount of Coverage shall not be less than one Million Dollars ($1,000.000.000). Invoice settlement services for payment concealment of ($200,400.00), Kickback to , WELLS FARGO BANK N.A. Client 1. FIDELITY NATIONAL TITLE INSURANCE COMPANY, FIDELITY/LPS, MOSS & ASSOCIATION ,

ROGERS TOWNSEND & THOMAS, PC, knowingly Concealed that PHH

Mortgage Servicing the Servicer agrees to maintain in full force and effect.

A professional Liability Policy. The minimum amount of Coverage shall not

be less than one Million Dollars ($1,000.000.000). Invoice settlement

services for payment concealment of ($272,897.53),Kickback to WELLS

FARGO BANK N.A. DEFAULT ASSIGNMENT OF MORTGAGE FILED OCT 31,2013

And Signed OCTOBER 25TH, 2013, was paid in full and that the Plaintiffs did

not get the Mortgage Release from WELLS FARGO BANK N.A Servicing

stating that the Plaintiff Mortgage Released. See: Next ¶. Id at.108 WELLS

FARGO BANK N.A. DEFAULT ASSIGNMENT OF MORTGAGE OCTOBER 25TH,

2013, see: EXHIBITS-B stating that the Defendants Nonpayment of. Or

defaulted. WELLS FARGO BANK N.A. DEFAULT ASSIGNMENT OF MORTGAGE

OCTOBER 25TH, 2013, WELLS FARGO BANK N.A. are required to provide the

Discharge to the Registry of Deeds when the Mortgage is paid in full by

Default insurance, WELLS FARGO BANK N.A by Rule failed to report to

The Registry of Deeds Office, Wells Fargo force-placed insurance class

action lawsuit and brought forth allegations of breach of contract, breach of

implied covenant of good faith and fair dealing, unjust enrichment, breach

of fiduciary duty, [ See **Fladell, et al. v. Wells Fargo Bank NA, et al**., Case

No. 0:13-cv-60721, in the U.S. District Court for the Southern District of

Florida. **FRAUD ON THIS COURT**

**EXHIBIT-B**

**WELLS FARGO BANK
N.A. TRUST**

Case 17-03271-dd    Doc 17    Filed 10/04/17    Entered 10/04/17 15:51:41    Desc Main
Document: 029    Page 27 of 28

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:

DEFAULT ASSIGNMENT
WELLS FARGO BANK, N.A.
MAC X9999-01P
PO BOX 1629
MINNEAPOLIS, MN 55440-9049

FILED  Oct 31, 2013   31:35:47 pm
BOOK   02300
PAGE   0236  thru  0236
INSTRUMENT # 2013004166

FILED
ORANGEBURG
COUNTY
ELAINE G. ALEXANDER
REGISTER
OF DEEDS

**CORPORATE ASSIGNMENT OF MORTGAGE**

Orangeburg, South Carolina
"HENDERSON"

MERS #:                          SIS #: 1-888-679-6377

Date of Assignment: October 29th, 2013
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR HOMEOWNERS MORTGAGE ENTERPRISES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS at BOX 2026 FLINT MI 48501, 1901 E VOORHEES ST STE C., DANVILLE, IL 61834
Assignee: WELLS FARGO BANK, NA at 1 HOME CAMPUS, DES MOINES, IA 50328

Executed By: CONNIE HENDERSON  To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR HOMEOWNERS MORTGAGE ENTERPRISES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS
Date of Mortgage: 05/22/2003 Recorded: 05/22/2003 in Book/Reel/Liber: 01331 Page/Folio: 00059 as Instrument No.: 2003001582 in the County of Orangeburg, State of South Carolina.

Property Address: 123 SNAPOVER LANE, ORANGEBURG, SC 29115

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $134,019.00 with interest, secured thereby, with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR HOMEOWNERS MORTGAGE ENTERPRISES, INCORPORATED, ITS SUCCESSORS AND ASSIGNS
On  10-29-2013

By
Stephanie Thomas Thielges
Assistant Secretary

WITNESS
Kelsie Elizabeth Gruenwald

WITNESS
Casie Lee Naughton

STATE OF Minnesota
COUNTY OF Dakota

On 10-29-2013, before me, Andrew M. Applequist, a Notary Public in Dakota County in the State of Minnesota, personally appeared Stephanie Thomas Thielges, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

Andrew M. Applequist
Notary Expires: 1/31/2017

ANDREW M. APPLEQUIST
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2017

(This area for notarial seal)

PREPARED BY: WELLS FARGO BANK, N.A.

**EXHIBIT-B**

Client 2. FIDELITY NATIONAL TITLE INSURANCE COMPANY,
ROGERS TOWNSEND & THOMAS, PC knowingly Concealed that the
ROGERS TOWNSEND & THOMAS, PC, agrees to maintain in full force
and effect. A professional Liability Policy. The minimum amount of
Coverage shall not be less than one Million Dollars ($1,000.000.000).
Invoice settlement services for payment concealment of ($270,900.00),
Kickback to ROGERS TOWNSEND & THOMAS, PC, FIDELITY
NATIONAL TITLE INSURANCE COMPANY, MOSS & ASSOCIATION
FIRM LLP, knowingly Concealed that MOSS & ASSOCIATION agrees to
maintain in full force and effect. A professional Liability Policy. The
minimum amount of Coverage shall not be less than one Million Dollars
($1,000.000.000). Invoice settlement services for payment concealment of
($270,900.00), Kickback to MOSS & ASSOCIATION
we are demanding and requesting that The Law office of ROGERS
TOWNSEND & THOMAS, PC  and Attorneys JOHN J.HEARN Bar #6635),
JASON D. WYMAN Bar Number:#100271), KEVIN T. BROWN, Bar
Number:#64236), CYNHIA THOMAS Default Law Firm ROGERS
TOWNSEND & THOMAS, PC and MOSS & ASSOCIATION, and all the
Servicing Company that you and Firm represent are required to provide the
Discharge to the Registry of Deeds when the Mortgage is paid in full by
Default insurance, instead sent back to the System. MERS Every time a
Note or servicer changes hands, a notation of that change is made
(electronically) on the MERS® System. Demands strict proof thereof. at

**Jury Trial**  Mr. CURTIS HEPHERD has suffered damage by $1,625,400,

by each of the Plaintiffs for Concealment of Default Insurance Payment that
was paid out from the Defendants Property and using Defendants Names
to secure Insurance Payments from a fraudulent Insurance Kickback-
scheme. JASON T. MOSS, and has received at least $61,000 of the fraud-
███████ █ ██████.

Because she has no legitimate claim to these fraud-tainted funds, the court

should freeze her assets in an equivalent amount in order to further

12 Pursuant to Fed. R. Civ. P. 65(b)(4), Defendants will have an
opportunity to request a modification of the asset freeze order to allow for
funds reasonable and necessary for living expenses and legal fees.

protect the victims of the fraud. **See SEC v. Antar**, 831 F. Supp. 380, 402-

03 (D.N.J. 1993) ("[A]s between the [relief] defendants and the victims of

the fraud, equity dictates that the rights of the victims should control.").

**F. Entry of an ex parte order is appropriate under the circumstances
here.**

> **202.**   The Fraud Injunction Statute specifically provides that the

Court may enter a restraining order ―as is warranted to prevent a

continuing and substantial injury to … any person or class of persons for

whose protection the action is brought‖ and to ―prohibit any person from

withdrawing, transferring, removing, dissipating, or disposing of any such

property‖ that was ―obtained as a result of a banking law violation. ‖ 18

U.S.C. § 1345 (a)(2)(B)(i), (b). Rule 65(b) provides that a court may enter a

temporary restraining order (TRO) without notice to the opposing party

where it appears that ―immediate and irreparable injury, loss, or damage

will result‖ before the adverse party can be heard in opposition.

**203.** The Fraud Injunction Statute specifically provides that the Court may enter a restraining order —as is warranted to prevent a continuing and substantial injury to … any person or class of persons for whose protection the action is brought‖ and to —prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property‖ that was —obtained as a result of a banking law violation. ‖ 18 U.S.C. § 1345 (a)(2)(B)(i), (b). Rule 65(b) provides that a court may enter a temporary restraining order (TRO) without notice to the opposing party where it appears that —immediate and irreparable injury, loss, or damage will result‖ before the adverse party can be heard in opposition.

**204.** Consumer fraud cases like this one fit squarely into the narrow category of situations where ex parte relief is not only appropriate but necessary to make possible full and final effective relief. Courts have regularly issued ex parte TROs in cases involving foreclosure-rescue schemes. See Exh. A for examples of ex parte TROs in foreclosure-rescue cases.

**205.** As set forth in the attached Rule 65(b) declaration, notice to Defendants will impair the ability to provide full and final effective relief to victims, because Defendants have been dissipating and may continue to dissipate assets, depleting funds available to restore victims. If Defendants fraud is not immediately halted, immediate and irreparable harm will occur,

hundreds of homeowners will continue to convey title to their homes to FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE ), to pay FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE) —rent, ‖ and additional homeowners will be snared into the scheme. In cases such as this one, where Defendants ' entire business operation is based on fraud, there is a strong likelihood that

206.    Defendants will attempt to dissipate assets and destroy evidence. In fact, the individual Defendants have consistently dissipated the —rent‖ payments collected by FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE for their personal use. If Defendants are provided notice, they are likely to further dissipate what remains of the fraud proceeds, thus depriving the victims of Defendants 'scheme any chance of meaningful relief.

207.    The State of South Carolina may enforce the federal MARS Rule by obtaining injunctive relief under Section 626(b) of the 2009 Omnibus Appropriations Act. 16 C.F.R. §322.10. Section 626(b) provides that the attorney general of a state who —has reason to believe that an interest of the residents of the State has been or is threatened or adversely affected‖ may file an action to —to enjoin that practice . . .; —to enforce compliance with the rule‖; [or] —to obtain . . . relief provided under the . . .

Federal Trade Commission (FTC) Act. . .. ‖ See 2009 Omnibus

Appropriations Act, as amended

  **208.** Defendants are subject to the MARS Rule as providers of

—Mortgage Assistance Relief Service, ‖ which is a program that is

represented to consumers as a way of:

> (1) Stopping, preventing, or postponing any mortgage or deed
> of trust foreclosure sale for the consumer's dwelling, any
> repossession of the consumer's dwelling, or otherwise
> saving the consumer's dwelling from foreclosure or
> repossession;
> (2) Negotiating, obtaining, or arranging a modification of any
> term of a dwelling loan, including a reduction in the amount
> of interest, principal balance, monthly payments, or fees;

. . . .

16 C.F.R. § 322.2(i).

  **209.** Defendants 'conduct violates section 322.3(b) of the

MARS Rule by misrepresenting to homeowners the following regarding

FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND &

THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS

TRUSTEE 'services: (1) you can avoid foreclosure by transferring title to

FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND &

THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS

TRUSTEE and entering into a lease agreement with, and paying  rent‖ to,

MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC,

WELLS FARGO BANK  N.A. TRUST COMPANY, AS TRUSTEE will

purchase your mortgage from the lender and allow you to repurchase the home after three years below market value; (3) you can apply 60 percent of the —rent‖ paid to MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE to the repurchase price; and (4) federal law protects you from eviction by entering into a lease agreement with MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK  N.A. TRUST COMPANY, AS TRUSTEE.

210.  Defendants 'conduct violates section 322.3(c) of the MARS Rule by making a representation about the benefits of its mortgage assistance relief service without competent and reliable evidence that substantiates that the representation is true by the following: (1) claiming that lender will sell a homeowner 's mortgage to FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE.at a discount; (2) claiming that a forensic audit and legal challenge to the foreclosure increases the likelihood that the lender will sell the mortgage at a discount; (3) that the lease agreement with FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE . offers any protection to the homeowner from foreclosure or eviction; (4) that paying FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE . thousands of dollars in

—rent‖ could result in avoiding foreclosure and being in a position to repurchase the home at a significant discount; and (5) mortgage payments could be reduced by 40 to 60 percent.

211.    Defendants 'conduct violates section 322.5(a) of the MARS Rule by collecting millions of dollars in advance fees from homeowners in the form of —rent. ‖ FIDELITY/LPS, FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE . requires homeowners who enter the program to pay in advance the equivalent of three-months —rent‖ and a monthly —rental‖ amount for the term of the lease. The lease, however, is a sham that offers no protection from foreclosure or eviction. Section 322.5 allows for the collection of a fee only after the consumer has executed a written agreement between the consumer and the consumer's lender incorporating the offer of mortgage assistance relief the provider obtained from the lender. Because FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE. has never obtained such an agreement with a lender, all the fees it has collected since March 1, 2021, violate federal law.

212.    Each of the individual Defendants 'conduct violates section 322.6 of the MARS Rule by providing substantial assistance or support to FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST

COMPANY, AS TRUSTEE while knowing or consciously avoid knowing that FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE is engaged in practices violating the MARS Rule. The individual Defendants know, for instance, that homeowners have been foreclosed upon and evicted, despite signing up with, and paying thousands of dollars to, FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE. They also know that FIDELITY/LPS, FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE has not purchased a single mortgage despite being in operation for nearly two years. They know that the litigation strategy has failed time and again. And they know that FIDELITY/LPS, FIDELITY/LPS, MOSS & ASSOCIATION ROGERS TOWNSEND & THOMAS, PC, WELLS FARGO BANK N.A. TRUST COMPANY, AS TRUSTEE lacks the financial capacity to purchase any mortgages. Despite this knowledge, the individual Defendants provide substantial assistance to support the fraudulent scheme.

213. The Court has the authority to grant preliminary relief under Sections 13(b) and 19(a)-(b) of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 53(b), § 57(a)-(b). See Section 626 of the 2009 Omnibus Appropriations Act, as amended; FTC v. H.N. Singer, 668 F.2d 1107, 1111 (9th Cir. 1982). The Tenth Circuit has explained that the FTC Act's grant of

authority to provide injunctive relief carries with it the full range of equitable remedies . . .. ‖ FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1202 n.6 (10th Cir. 2005). This Court may order whatever temporary or preliminary relief is necessary to prevent ongoing consumer injury. H.N. Singer, 668 F.2d at 1113; FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1432 (11th Cir. 1984) (stating that a court —has the inherent power of a court of equity to grant ancillary relief, including freezing assets. ‖). Here, the attached declarations demonstrate that South Carolina is entitled to temporary and preliminary relief to prohibit the continuation of Defendants 'deceptive acts and practices. The FTC Act allows courts to grant preliminary injunctions provided there is a —proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, [granting the injunction] would be in the public interest. . . .‖ Klay v. United Health group, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004). The public interest should receive greater weight particularly where the evidence demonstrates that a business is rooted in deception, for a —court of equity is under no duty to protect illegitimate profits or advance business which is conducted [illegally]. ‖ FTC v. British Am. Commodity Options Corp., 560 F.2d 135, 143 (2d Cir. 1977) (quoting FTC v. Thomsen-King & Co., 109 F.2d 516, 519 (7th Cir. 1940)) (internal quotations omitted).

    **214.**   The scheme disproportionately affects victims In The United States. Absent injunctive relief by this Court, Defendant's conduct will continue to cause injury to victims.

## COUNT I
## (18 U.S.C. § 1345 – Injunctive Relief)

**215.** The United States re-alleges and incorporates by reference Paragraphs 1 through 235 of this Complaint as though fully set forth herein.

**216.** By reason of the conduct described herein, Defendant violated, is violating, and is about to violate 18 U.S.C. §§ 1341 and 1343 by facilitating a scheme and artifice to defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use the United States mails and interstate or foreign wire communications. Upon a showing that Defendant is committing or about to commit mail or wire fraud, the United States is entitled, under 18 U.S.C. § 1345, to seek a permanent injunction restraining all future fraudulent conduct and to any other action that this Court deems just and proper to prevent a continuing and substantial injury to victims.

As a result of the foregoing, the Court should enjoin Defendant's conduct under 18 U.S.C. § 1345.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, requests of the Court the following relief:

A. That the Court issue a permanent injunction, pursuant to 18 U.S.C. § 1345, ordering that Defendant is restrained from engaging, participating, or assisting in any lottery scam or money transmitting business; and Defendants for Concealment of Default Insurance Payment that was paid out from the

Plaintiffs Property And using Plaintiffs Names to secure Insurance Payments from a Fraudulent Insurance Kickback-scheme Invoice settlement services for payment

B. That the Court order such other and further relief as the Court shall deem just and proper.

**CURTIS   SHEPHERD DEMANDS A TRIAL BY JURY  OF ANY AND ALL ISSUES BEFORE THE COURT AND TRIABLE BY A  JURY**

Respectfully submitted on this 7 day of June 2022

CURTIS   SHEPHERD
123 SNAP OVER LANE
ORANGE BURG, SC  29115
(646)706-9736
Appellant pro se litigants

## CERTIFICATE OF SERVICES

**I HEREBY CERTIFY** that a copy of the foregoing Plaintiffs MOTION

FOR AN EX-PARTE TEMPORARY RESTRAINING ORDER, SHOW

CAUSE ORDER, AND PERMANENT INJUNCTION WITH ASSET

FREEZE COMPLAINT FOR PERMANENT INJUNCTION of Defendant's

ON Monday, June 6, 2022, was served by Certified Registered Letter

on June 6, 2022 to the below listed parties:

**U.S. Department of Justice**
**Attorney General Merrick B. Garland**
**Office of the Attorney General**

**950 Pennsylvania,**
**Washington, DC 20530-0001**

**U.S. Department of Justice**
**Assistant Attorney General Kristen Clarke**
**Civil Rights Division**
**950 Pennsylvania, NW**
**Washington, DC 20530-0001**

**U.S. Department of Justice**
**Richard A. Powers**
**Acting Assistant Attorney Genera**
**ANTITRUST DIVISION**
**950 Pennsylvania, NW**
**Washington, DC 20530-0001**

## Other Counsel of Record:

Jason T. Moss, Esquire
Moss & Associates
816 Elmwood Avenue
Columbia, SC 29201
(803) 933-0202
Lindsey@mossattorneys.com
(Respondent,)

WELLS FARGO BANK  N.A.
PO BOX 14411 Des Moines ia
50306-341
(Respondent,)

LEAD ATTORNEY
John J. Hearn (I.D. 6494)
Jason D. Wyman (I.D. 11294)
Kevin T. Brown (I.D. 5801)
Attorneys for Movant
Rogers Townsend & Thomas, PC
Post Office Box 100200

Columbia, South Carolina 29202
(803) 744-4444
Jason.wyman@rtt_law.com

**Mr. Jason David Wyman**
**Womble Bond Dickinson (US) LLP**
**550 South Main Street**
**Suite 400**
**Greenville, SC 29601**
**jason.wyman@wbd-us.com**
**(864) 255-5421**

**Mr. Kevin Ted Brown**
**Scott and Corley, P.A.**
**2712 Middleburg DR #200**
**Columbia, SC 29204**
**kevinb@scottandcorley.com**

**June 7, 2022**

**CURTIS   SHEPHERD**
**123 SNAP OVER LANE**
**ORANGE BURG, SC  29115**
**(646)706-9736**
**Appellant pro se litigants**